**FORD MOTOR COMPANY; Freightliner Truck Corporation; Sterling Truck Corporation; Metro Ford Truck Sales, Inc.; and Daniel H. Foley, Jr./Motor Vehicle Board of the Texas Department of Transportation, Appellants,**

v.

**MOTOR VEHICLE BOARD OF THE TEXAS DEPARTMENT OF TRANSPORTATION/METRO FORD TRUCK SALES, INC.; Daniel H. Foley, Jr.; Freightliner Truck Corporation; Sterling Truck Corporation; and Ford Motor Company, Appellees.**

No. 03–99–00265–CV.

Court of Appeals of Texas, Austin.

June 22, 2000.

Rehearing Overruled July 27, 2000.

---

James A. Pikl, MnKinney, for Metro Ford & Foley.

P.M. Schenkkan, Graves, Dougherty, Hearon & Moody, Austin, for Freightliner & Sterling.

Linda B. Secord, Asst. Atty. Gen., Austin, for Motor Veh. Bd.

Kenneth R. Valka, Baker & Hostetler, L.L.P., Houston, for Ford Motor Co.

Jeffee Martinez-Vargas, Asst. Atty. Gen., Austin, for Motor Vehicle Bd.

Before Justices JONES, KIDD and PATTERSON.

JAN P. PATTERSON, Justice.

We grant the motion for rehearing of the Motor Vehicle Board, withdraw our original opinion and judgment issued April 27, 2000, and substitute this one in its place.

This is an appeal from a district court judgment affirming in part and reversing and remanding in part an order of the Motor Vehicle Board of the Texas Department of Transportation ("Board"). The order adopted findings of fact, conclusions of law, and recommendations contained in a Proposal for Decision ("PFD") issued by an administrative law judge ("ALJ") following a contested case hearing involving Ford Motor Company ("Ford"), Freightliner Truck Corporation, Freightliner's wholly-owned subsidiary, Sterling Truck Corporation (collectively "Freightliner"), Ford's franchisee Metro Ford Truck Sales, Inc., and Metro's dealer-principal, Daniel H. Foley, Jr. (collectively "Metro"). We will affirm the district court judgment.

## BACKGROUND

Metro is a Texas corporation licensed to sell heavy, medium, and light duty trucks manufactured by Ford. Ford opened Metro as a dealer development corporation in Dallas, Texas in 1971. Daniel Foley, Sr. worked as a paid manager at Metro and received a percentage of the corporation's profits as a bonus. Within approximately two years of Metro's opening, Foley, Sr. applied his bonuses to the purchase of the corporation's stock. He operated the Metro dealership until his retirement in 1987, at which time his son, Daniel Foley, Jr. ("Foley"), became the dealer-principal.

Metro's current dispute with Ford began in 1994. The controversy centers on a program instituted by Ford to provide discounts on trucks to its dealers. To understand the nature of the conflict, it is necessary to examine how wholesale prices are established for medium and heavy duty Ford trucks. Most medium and heavy duty trucks are sold to large commercial customers who solicit bids from various dealers. Although Ford provides dealers like Metro with published wholesale prices for medium and heavy duty trucks, the wholesale prices are generally higher than the estimated retail price, or "street price." To enable its dealers to remain competitive with the dealers of other truck manufacturers and to allow its dealers to make a profit, Ford instituted the Competitive Price Assistance ("CPA") program to reduce wholesale delivered prices below street prices.

Ford's CPA program works in several ways. If a potential medium or heavy duty truck customer advises a licensed Ford dealer of a competitor's lower bid on a similar make and quantity of trucks, the Ford dealer can call a hotline to request a price concession known as "sales advantage CPA." In general, sales advantage CPA is stated as a percentage of the wholesale delivered price for a particular series of Ford trucks and does not differ among dealers. To obtain this concession, the dealer must provide the CPA operator certain basic information about the potential sale, including the customer's name and address, size of the customer's fleet, series and quantity of trucks required, published price of the trucks, and requested options. The dealer must also specify which competitor's truck the customer has expressed an interest in purchasing. The hotline operator then provides the dealer with a base CPA amount and a commitment log number, which tracks the transaction and ensures the dealer price protection for sixty days.

If the sales advantage base CPA amount does not provide a sufficient price reduction, the dealer may seek "appeal level CPA" by faxing an appeal form to the Ford CPA processing center in Dearborn, Michigan. To substantiate the need for the additional allowance, the dealer must supply information describing the competitive situation surrounding the prospective purchase, including prior bids won or lost to the customer; if lost, to whom and by how much per unit; the per unit CPA request; the street price of the truck; and the street price based on the competition's actual or estimated bid. Competitive need may also be established by including any of the following with the appeal form: a copy of the competitive quotation obtained from the customer; a statement by the dealer that he has been shown a competitive quotation and price by the customer, and that CPA in the amount requested is necessary to meet the competitive quote; a statement by the dealer that he has been advised by the customer of the amount needed to meet a competitive bid; or a brief history of recent bids to the account, or similar accounts, that indicate pricing assistance currently offered by the competition.

Ford CPA pricing managers review appeals for completeness and compare the requested CPA allowance to historical information on similar bids. The managers also review their records to determine if another Ford dealer is bidding to the same customer in order to equalize the CPA amounts offered to each dealer. If the CPA managers conclude that the dealer has substantiated competitive need, appeal CPA is granted and the dealer receives verification of the amount of appeal CPA and an approval code. When the trucks are sold, the dealer can receive CPA payment either by means of a credit on the vehicle invoice or through a direct payment from Ford.

A third component of the CPA program, known as the "CPA package," is a standardized CPA allowance above sales advantage CPA that is sometimes granted to large volume purchasers who purchase vehicles over a defined time period. A CPA package establishes a specific CPA amount for all trucks ordered by a particular customer during a specified period of time; thus, Ford dealers bidding for that customer's business are not required to request sales advantage and appeal CPA each time they bid. Similar to the CPA package is the heavy truck leasing sales allowance, which provides dealers standardized CPA allowances when bidding to customers listed on a schedule of large volume purchasers.

In 1993, a Ford heavy duty truck dealership in Fort Worth complained to Ford area sales representative Don Yegan that it was losing business to Metro because Metro was receiving larger CPA allowances on its heavy duty trucks and therefore could offer the trucks to consumers at lower retail prices. The Fort Worth dealer-principal, Ken Nichols, told Yegan that

his sales staff had researched Metro's winning bids and discovered that the vehicles in question were not registered to the customers for whom Metro had requested CPA allowances. This discrepancy raised suspicion that Metro, rather than submitting CPA requests in the names of its prospective truck purchasers, had been applying for CPA in the names of customers to whom Ford typically granted larger CPA allowances. Yegan brought the complaint to the attention of his supervisor, regional sales manager Mike Steckler. Steckler compared the data provided by Metro regarding end-user customers with state registration data and agreed that the customer names did not match.

Steckler reported his findings to his supervisor, Eric Magus, who instructed him to expand his research to determine if Metro's apparent abuse of the CPA program was more widespread. Magus also instructed Steckler not to inform Metro its CPA practices were being investigated. The additional investigation, which took place over a period of two months, revealed that the impropriety reported by Nichols was not an isolated incident. In October 1993, Magus recommended to his supervisors that Ford audit Metro.

In March or April 1994, Eric Showgren, a senior auditor for Ford, began a comprehensive audit of Metro, which included an examination of heavy duty truck sales over the preceding two years for which Metro had requested and received appeal level CPA. Metro provided Showgren with its "deal files," which contained documenta-

tion in the names of the customers for whom appeal CPA had been requested. However, Metro failed to provide Showgren with its "white files," which contained documents, such as order forms and title and financing applications, in the names of the actual end-user customers. Showgren noticed that the Metro "deal files" did not contain the customary title and financing documentation and asked whether the missing documents might be located elsewhere. Foley told Showgren that Metro did not process title or financing applications for heavy duty trucks.

Over the course of the two-week audit, Showgren compared the documents he was provided to state registration information and confirmed that Metro had been applying for CPA in the name of one customer while actually selling the truck to another customer. This practice had allowed Metro to secure higher amounts of appeal level CPA than if it had submitted the names of the actual customers. Because Showgren could find no legitimate explanation for a majority of the mismatched CPA customers and actual customers, he recommended to his supervisors that Ford, pursuant to paragraphs 12(b) and 17(b)(2) of its franchise agreement with Metro, require Metro to reimburse Ford the difference between the appeal CPA allowances received by Metro and the amount of CPA Metro would have received had it submitted appeals in the names of the actual customers.[1]

At the audit closing conference on June 27, 1994, Showgren met with Foley and his

---

1. Paragraph 12(b) of the standard provisions of the Ford Heavy Duty Truck Sales and Service Agreement provides:

   The Dealer shall allow persons designated by [Ford], at reasonable times and intervals and during normal business hours, to examine the DEALERSHIP FACILITIES and OPERATIONS, the Dealer's stocks of COMPANY PRODUCTS and used vehicles and vehicles at the DEALERSHIP FACILITIES for service or repair, to test the Dealer's equipment, to check and instruct the Dealer and his employees in the proper handling of warranty and other repairs and claims

based thereon, and *to examine, copy and audit any and all of the Dealer's records and documents. [Ford] may charge back to the Dealer all payments or credits made by [Ford] to the Dealer pursuant to such claims or otherwise which were improperly claimed or paid.* (Emphasis added.)

Paragraph 17(b)(2) provides the "submission by the Dealer to [Ford] of any false or fraudulent application or claim" relating to heavy duty truck sales incentives, allowances, or discounts may result in the termination or nonrenewal of the sales and service agreement.

sister, Metro general manager Eileen Beard, and informed them that the estimated "chargeback" was $3.1 million.[2] Ford regional sales manager Les Brown also informed Foley that he would recommend the Metro franchise be terminated for fraud. Foley protested, arguing that Ford representatives had instructed and encouraged his sales staff to apply for appeal CPA using customer names other than the end-user customers in order to sell more trucks. Brown told Foley that he had thirty days to provide Ford with any documentation that might reduce the amount of the proposed chargeback and that Foley could appear before the Ford Dealer Policy Board[3] to dispute the allegations of fraud.

On July 19, 1994, Metro sued Ford in state district court in Dallas County alleging breach of contract and antitrust violations. Metro's breach of contract claim was based on its contention that Ford violated paragraph 10 of its franchise agreement with Metro by failing to publish appeal level CPA amounts.[4] Metro's antitrust claim was based on its allegation that by setting high wholesale prices, Ford required Metro to use CPA for every transaction and thereby controlled Metro's retail price. Ford filed a counterclaim seeking actual and punitive damages based on Metro's alleged CPA misrepresentations.

In response to Ford's requests for admissions, Metro admitted that from 1992 until 1994, it had requested CPA discounts on 317 heavy duty trucks in the names of certain customers and then sold the trucks to other, unrelated customers. Metro manipulated the CPA program in two ways. First, it misrepresented to Ford that trucks being bid on would be sold to heavy truck leasing customers listed on Ford's schedule of large volume purchasers. Second, Metro used CPA packages, which were designed to facilitate sales of a large number of trucks to a single customer, to order individual trucks for unrelated purchasers. Metro also admitted that for each vehicle sold, it had prepared two sets of sales invoices—one in the name of the actual customer and one in the name of the customer used in the CPA request. Metro acknowledged that requesting CPA in the name of a customer other than the customer to whom the truck was being sold was contrary to Ford's written policy and directives[5] but asserted that it had engaged in the practice in accordance with express instructions from Ford representatives.

The Dallas County district court granted Metro a temporary restraining order

---

2. Showgren later reduced the chargeback amount to $1.3 million based on his review of industry data and documents provided to Ford by Metro during the course of litigation. During the contested case hearing, Ford's expert witness, Dr. Thomas Saving, testified that Metro received $290,975 in appeal level CPA that it would not have received had it not misrepresented to Ford the names of its customers.

3. The Ford Dealer Policy Board reviews dealer complaints regarding actions by Ford. The Board is composed of Ford employees who serve on the Board for life and cannot work anywhere else within Ford. The Board members report to a Ford executive vice president for company relations. Board decisions are binding on Ford but not on the complaining dealer; thus, if the Board concludes that Ford's actions were justified, the complaining dealer may still exercise its legal rights against Ford.

4. Paragraph 10 provides:

> Sales of COMPANY PRODUCTS by [Ford] to the Dealer hereunder will be made in accordance with the prices, charges, discounts and other terms of sales set forth in price schedules or other notices published by [Ford] to the Dealer from time to time in accordance with the applicable HEAVY DUTY TRUCK TERMS OF SALE BULLETIN or PARTS AND ACCESSORIES TERMS OF SALE BULLETIN.

5. The Ford Heavy Duty Truck Sales and Service Agreement prohibits CPA misrepresentations in paragraph 17(b)(2), *see supra* note 1, and several bulletins sent by Ford to its dealers since the time Foley, Jr. became the dealer-principal at Metro reiterated the importance of complying with that paragraph.

on August 2, 1994 to prevent Ford from terminating Metro's franchise agreement and from collecting any chargeback. The temporary restraining order was extended by agreement on three separate occasions. On December 6, 1994, the Dallas court rendered an order that dissolved the prior restraining orders and dismissed Metro's requests for temporary and permanent injunctive relief to prohibit Ford from issuing a notice of termination of Metro's franchise agreement or initiating actions designed to terminate the agreement.[6]

On December 14, 1994, Metro filed a complaint and protest and request for an interlocutory cease and desist order with the Board. Metro argued that Ford's proposed chargeback and termination violated the Motor Vehicle Commission Code, which prohibits vehicle manufacturers from terminating a dealer without good cause. See Tex.Rev.Civ. Stat. Ann. art. 4413(36), § 5.02(b)(3) (West Supp.2000) ("Code").[7] Metro also argued that the proposed chargeback was unlawful because it would force Metro to absorb the cost of CPA discounts made by Ford in favor of Metro's customers and because it would result in unreasonable discrimination among Ford dealers. See id. §§ 5.02(b)(14), (21).

On December 16, the Board issued a statutory stay pursuant to section 3.08A of the Code [8] and ordered Ford to cease and desist from terminating Metro's franchise agreement; assessing chargebacks to Met-

**6.** On May 30, 1995, Ford removed the Dallas County district court case to the United States District Court for the Northern District of Texas. On October 20, 1997, the federal district court found that Ford's CPA program was "pro-competitive" and issued an order granting Ford's motion for summary judgment on Metro's federal antitrust claims. Metro's remaining state law claims, which included breach of contract, promissory estoppel, unjust enrichment, negligent misrepresentation, violation of the Texas Deceptive Trade Practices Act, and violation of the Texas Free Enterprise and Antitrust Act of 1983, were remanded to state court, as were Foley's affirmative claim of intentional infliction of emotional distress and Ford's affirmative claims of fraud, breach of contract, breach of a duty of good faith and fair dealing, and RICO violations. The United States Court of Appeals for the Fifth Circuit affirmed the judgment of the federal district court in Metro Ford Truck Sales, Inc. v. Ford Motor Co., 145 F.3d 320 (5th Cir.1998), cert. denied, 525 U.S. 1068, 119 S.Ct. 798, 142 L.Ed.2d 660 (1999). On February 7, 1998, the Dallas County district court granted partial summary judgment (1) finding Ford liable on Metro's claims for breach of contract and antitrust violations and (2) dismissing Ford's affirmative claims. A jury trial was held on the issues of Metro's damages and attorney's fees. The jury awarded zero damages on Metro's breach of contract and antitrust claims but awarded Metro $800,000 in attorney's fees. On appeal, the Fifth Court of Appeals affirmed the trial court's judgment that Metro recover zero damages on its breach of contract claim, reversed the trial court's judgment and rendered judgment that Metro take nothing on its

state antitrust claim and its claim for attorney's fees, and reversed and remanded for further proceedings Ford's claims for breach of contract, fraud, and RICO violations due to Metro's failure, as a summary judgment movant, to conclusively prove that Ford's chargeback damages were unrecoverable as a matter of law. See Ford Motor Co. v. Metro Ford Truck Sales, Inc., No. 5–99–031–CV, 1999 WL 1126280 (Tex.App.—Dallas Dec. 9, 1999, pet. filed) (not designated for publication). The appellate court also concluded that Ford waived any complaint that the trial court erred in dismissing Ford's claim for breach of a duty of good faith and fair dealing.

**7.** We will cite to the current version of the Code unless inconsistent with provisions of the Code in effect during these proceedings.

**8.** Section 3.08A(a) provides:

Upon the initiation of any [Board] proceeding, whether by complaint, protest, or otherwise, no person who receives notice from the [Board] of a statutory stay imposed by this Act may allow or commit any act or omission which would constitute a violation of this Act or any rule, order, or decision of the [Board] or which would affect the legal rights, duties, or privileges of any party before the [Board] or which would tend to render ineffectual a [Board] order in any pending proceeding. A statutory stay imposed by this Act remains in effect until vacated or until the proceeding is concluded by final order or decision.

Tex.Rev.Civ. Stat. Ann. art. 4413(36), § 3.08A(a) (West Supp.2000).

ro; placing Metro on a cash-on-delivery basis for new trucks, services, or parts; or refusing to grant CPA allowances to Metro on terms identical to the maximum terms offered to other Ford dealers. *See id.* § 3.08A. On January 25, 1995, the Board entered an agreed order removing any reference to termination in the interlocutory cease and desist order, and Ford initiated termination proceedings against Metro on February 6, 1995, pursuant to section 5.02(b)(3) of the Code. *See id.* § 5.02(b)(3)(A).

The contested case hearing on Metro's complaint was originally scheduled to begin on May 15, 1995. It was reset twice, once to June 1, 1995 and then to July 17, 1995, as a result of motions for continuance filed by Metro. Ford opposed both motions. The hearing was also abated for several months on Metro's motion until matters affecting the Dallas County district court case could be resolved. On June 26, 1996, Foley filed a complaint and protest with the Board, arguing that Ford had violated section 5.02(b)(8) of the Code by failing to give effect to the attempted transfer of Metro to his sister, Eileen Beard. *See id.* § 5.02(b)(8). Metro and Foley's complaints against Ford were consolidated, and the contested case hearing began on February 10, 1997.

During the hearing, Ford established that in some instances Metro had substituted its post office box or the post office box of one of its salesmen for the address of the customer in whose name Metro requested CPA in order to prevent the customer from receiving correspondence from Ford on a vehicle it did not purchase. The evidence also showed that Metro sometimes concealed the amount of profit it made on a transaction from Ford by indicating on CPA appeal forms and other documentation that it performed installation of equipment or other work on the trucks that the customer did not order and Metro did not do.

During the second week of the hearing, Ford announced that it intended to sell certain assets of its heavy duty truck division to Freightliner. The transaction took place in May 1997 and resulted in Ford's withdrawal from the nationwide heavy duty truck market, although Ford heavy duty truck dealers in good standing could apply to Freightliner for a franchise agreement. On August 27, 1997, Metro filed a motion to show cause, for production of documents, for expedited hearing, and for sanctions, arguing that Ford had violated the section 3.08A statutory stay by informing Freightliner that Metro was a dealer "not in good standing," thus preventing Metro from receiving a Freightliner franchise.

On September 19, 1997, the ALJ found that Freightliner had become a necessary party to the administrative proceeding. The ALJ further found that Ford, by informing Freightliner that Metro was not in good standing with Ford, had violated the statutory stay. The ALJ ordered Ford to send Freightliner a letter stating, "Metro Ford Truck Sales, Inc. is a qualified Ford Heavy Truck dealer in good standing as a matter of law. Ford hereby withdraws any prior communications made to you to the contrary." The ALJ also ordered Freightliner to cease and desist from not honoring Metro's status as a fully qualified, franchised Ford heavy duty truck dealer and to offer Metro a Freightliner dealer agreement on the same terms as all other qualified Ford heavy duty truck dealers.

On October 30, 1997, in response to Freightliner's motion to vacate, modify, or clarify the September 19 interlocutory cease and desist order, the ALJ modified the order to require Freightliner to offer Metro a franchise agreement on or before 3:00 p.m. CST on Monday, November 3, 1997, with the agreement contingent upon the outcome of the pending termination proceeding between Metro and Ford. The ALJ explained:

> If it is determined that Ford has shown good cause [for termination], then Ford can proceed with termination of Metro's

franchise. Since Freightliner HN–80 [9] is assuming the role of Ford Heavy Truck, the franchise agreement between Metro and HN–80 will also terminate if Ford is successful in the underlying termination proceeding. On the other hand, if Ford is unsuccessful in proving good cause for termination, then the franchise agreements between Ford and Metro and Freightliner HN–80 and Metro will remain in place unless and until new grounds for termination are shown.

On November 3, Freightliner informed the ALJ that it had tendered a franchise agreement to Metro under protest. The agreement contained a special conditions addendum with requirements different from those contained in Ford's franchise agreement. Metro objected, and on November 10, the ALJ concluded that Metro was not required to sign the Freightliner franchise agreement to secure a valid franchise. On November 26, the ALJ determined that because Freightliner was being substituted for Ford, the rights and obligations in the Ford/Metro franchise agreement would control the relationship between Freightliner and Metro throughout the remainder of the administrative proceeding.

On January 16, 1998, the ALJ issued a PFD, in which she concluded that: (1) Ford had established good cause to terminate Metro's franchise agreement; (2) Ford had established that the transfer of Metro to Eileen Beard would be detrimental to the public; (3) Ford was not entitled to recover monies collected by Metro in accordance with Ford's CPA program; and (4) the termination of Metro's franchise agreement should be conditioned upon the sale of the Metro dealership to a buyer selected by Ford and Freightliner at a price established by an independent appraiser. The Board issued an order on March 5, 1998 adopting the PFD in its entirety.

All parties sought judicial review of the Board's order. A Travis County district court affirmed the Board's order in part but determined that the remedy of a forced sale was unlawful and reversed and remanded the case to the Board for further proceedings. Ford, Freightliner, Metro, and the Board appeal the district court judgment. Ford primarily challenges the portion of the district court judgment remanding the case to the Board to fashion a new remedy and the Board's finding that Ford was not entitled to recover funds collected by Metro pursuant to the CPA program. Freightliner argues that the Board had no authority to order it to sell trucks to Metro or to help Metro find a buyer for its franchise. Metro contends that the Board erred in finding that Ford had good cause to terminate its franchise agreement with Metro and that Eileen Beard was not a qualified successor-dealer. Finally, the Board argues that the remedy it imposed upon the parties was lawful.

## DISCUSSION

The purpose of the Motor Vehicle Commission Code is to insure a sound system of distributing and selling motor vehicles through licensing and regulating manufacturers and dealers of those vehicles in order "to prevent frauds, unfair practices, discriminations, impositions, and other abuses" that threaten the public interest, the economy of this State, and the welfare of this State's citizens. Tex.Rev.Civ. Stat. Ann. art. 4413(36), § 1.02. The Board is charged with conducting the policy-making and regulatory functions and duties imposed by the Code. *See id.* The Board thus regulates the contractual relationship between new vehicle manufacturers and dealers who sell and service the new vehi-

---

9. Freightliner formed a wholly-owned corporate subsidiary, originally known as HN–80 Corporation and now known as Sterling Truck Corporation, to produce and distribute its line of heavy duty trucks.

cles pursuant to the terms of franchise agreements. *See id.* §§ 1.03(14), 5.02.

In deciding whether to license a vehicle dealership, the Board considers many factors, including the competitiveness of the marketplace, the fitness of the applicant's character, and the public interest. *See id.* § 4.06. Vehicle manufacturers are prohibited from terminating or refusing to continue any franchise with a dealer unless certain conditions are met. *See id.* § 5.02(b)(3)(A). A manufacturer seeking to terminate or refuse to continue a franchise must provide its franchisee dealer with written notice not less than 60 days before the effective date of termination or noncontinuance setting forth the specific grounds for termination or noncontinuance and informing the dealer that he may be entitled to file a protest with the Board. *See id.* § 5.02(b)(3)(A)(i)-(iii). If the affected dealer files a timely protest, the Board is charged with holding a contested case hearing to determine whether the franchisor has established by a preponderance of the evidence that there is good cause for the proposed termination or noncontinuance. *See id.* § 5.02(b)(3)(A)(iv). In determining whether good cause has been established for "modifying, replacing, terminating, or refusing to continue a franchise, or for forcing or attempting to force a dealer to relocate or discontinue a line-make or parts or products related to that line-make," the Board must consider "all the existing circumstances," including:

(A) the dealer's sales in relation to sales in the market;

(B) the dealer's investment and obligations;

(C) injury or benefit to the public;

(D) the adequacy of the dealer's service facilities, equipment, parts and personnel;

(E) whether warranties are being honored by the dealer;

(F) the parties' compliance with the franchise agreement; and

(G) the enforceability of the franchise agreement from a public policy standpoint.

*Id.* § 5.02(b)(5). If the franchise is terminated or not continued, another franchise in the same line-make must be established within a reasonable time unless the Board determines, by a preponderance of the evidence, that the community cannot reasonably support such a dealership. *See id.* § 5.02(b)(3)(C).

A dealer whose franchise has been terminated by a final order of the Board is entitled to judicial review of the order in a Travis County district court. *See id.* § 7.01(a).[10] The district court reviews final actions of the Board under the substantial evidence rule. *See id.* Under the substantial evidence rule, a reviewing court may not substitute its judgment for the judgment of the agency on the weight of the evidence on questions committed to agency discretion. *See* Tex. Gov't Code Ann. § 2001.174 (West 2000). A reviewing

10. Section 7.01(a) provides that appeals initiated in district court may be removed to this Court upon notice of removal to the district court by any party at any time prior to trial in the district court. *See* Tex.Rev.Civ. Stat. Ann. art. 4413(36), § 7.01(a). Section 7.01(a) also permits any party affected by a final order of the Board to initiate judicial review of the order in this Court. *See id.*

Freightliner, Sterling, and Ford filed petitions for judicial review of the Board's final order in this Court. Metro and Foley filed petitions for review in Travis County district court. On July 15, 1998, Ford filed a notice of removal of Metro's action to this Court pursuant to section 7.01(a). Metro and Fo-

ley's actions were removed to this Court. On August 31, 1998, this Court remanded all petitions related to the Board's final order to Travis County district court pursuant to section 7.01(d) of the Code, which provides that "[a]ppeals in which evidence outside the board's record is to be taken under Chapter 2001, Government Code, or otherwise, shall be initiated in a Travis County District Court, or having been initiated in the Court of Appeals, shall be subject to remand to a Travis County District Court for proceedings in accordance with instructions from the Court of Appeals." *Id.* § 7.01(d). No additional evidence was ever offered.

court must reverse or remand the case for further proceedings if the complaining party's substantial rights have been prejudiced because the agency's findings, inferences, conclusions, or decisions are:

(A) in violation of a constitutional or statutory provision;

(B) in excess of the agency's statutory authority;

(C) made through unlawful procedure;

(D) affected by other error of law;

(E) not reasonably supported by substantial evidence considering the reliable and probative evidence in the record as a whole; or

(F) arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion.

*Id.* § 2001.174(2)(A)-(F).

### *Metro's Challenges to the Board's Decision to Terminate*

■ Ford sought termination of Metro's franchise based upon sections 5.02(b)(5)(C) and (F) of the Code, alleging that Metro's abuse of the CPA program had injured the public and violated the Ford–Metro franchise agreement. The ALJ agreed and recommended termination. Metro challenges the Board's order adopting the ALJ's recommendation on three grounds.[11] The first is that there was no evidence in the record to support the ALJ's finding that Metro's CPA program abuse resulted in any injury to the public. *See id.* § 2001.174(2)(E).

■ The ALJ found in finding of fact 26 that "[t]he submission of false names and addresses prevented Ford from communicating with the true end-user customer regarding safety recalls and operational safety issues." In determining whether a finding of fact is reasonably supported by substantial evidence, we may not substitute our judgment for that of the agency on the weight of the evidence. *See id.*

§ 2001.174. We must, however, test the disputed finding against the body of evidence to determine whether such relevant evidence exists as a reasonable mind might accept as adequate to support a finding of fact. *See Lauderdale v. Texas Dep't of Agric.*, 923 S.W.2d 834, 835 (Tex.App.—Austin 1996, no writ) (citing *Pierce v. Underwood*, 487 U.S. 552, 564–65, 108 S.Ct. 2541, 101 L.Ed.2d 490 (1988)).

It is undisputed that in some instances Metro placed its post office box or the post office box of one of its salesmen on documents submitted to Ford to prevent the customer in whose name CPA was sought from being alerted to the practice. It is also undisputed that during the period in which Metro was misrepresenting customer names and addresses, Ford attempted to send safety recall information to the actual owners of trucks sold by Metro. Both Metro general sales manager Joel Laxson and Metro salesman Gayle Nelson testified that Metro received this safety recall information, but neither witness could state definitively that the safety information was forwarded to the actual truck owners. Laxson testified that the Metro office manager gave him recall notices that were delivered to Metro post office boxes. Laxson further testified that he forwarded the recalls to Metro salesmen with instructions to send the information to the actual customers. Nelson testified that he did not know what happened to mail delivered to Metro-controlled post office boxes but that he "thought" and "hoped" safety recall information was transmitted to the actual customers.

We conclude that reasonable minds could infer or find, from the foregoing evidence, that Metro's systematic interception of recall notices and other correspondence prevented Ford from communicating directly with the owners of Ford trucks purchased from Metro. Metro's actions placed the truck owners at risk of not

---

11. Metro does not challenge the factual findings of the Board with respect to "the termi- nation portion of the Board's order."

receiving important safety information. We therefore overrule Metro's issue concerning the lack of evidence to support finding of fact 26.

In its next ground, Metro argues that its substantial rights have been prejudiced because the Board abused its discretion by failing to consider Metro's contention that Ford should be estopped from seeking to terminate Metro's franchise because Ford district and regional personnel induced Metro's salesmen to violate the franchise agreement by submitting misleading information to Ford. *See* Tex. Gov't Code Ann. § 2001.174(2)(D), (F); *see also Texas Health Facilities Comm'n v. Charter Medical–Dallas, Inc.*, 665 S.W.2d 446, 453–54 (Tex.1984). In determining whether an agency act or omission is characterized by an abuse of discretion, a reviewing court must ascertain whether the agency based its decision on legally irrelevant factors or failed to consider legally relevant factors. *See Kawasaki Motors Corp. v. Texas Motor Vehicle Comm'n*, 855 S.W.2d 792, 795 (Tex.App.—Austin 1993, no writ); *Consumers Water, Inc. v. Public Util. Comm'n*, 774 S.W.2d 719, 721 (Tex. App.—Austin 1989, no writ).

The PFD details the ample evidence and argument heard by the ALJ concerning Metro's pattern of submitting inaccurate CPA information to Ford. The PFD includes a summary of testimony of three instances in which Metro claimed that Ford employees had instructed Metro salesman Allen Ludwig to apply for CPA discounts in the name of a customer other than the actual end-user customer. Further, Foley testified that Ford employees must have known about and approved of Metro's CPA practices, either because he had discussed his concerns regarding Ford's business practices with the Ford employees or because the Ford employees had worked closely with the Metro salesmen responsible for requesting CPA discounts.

The Ford employees alleged to have instructed Metro salesmen to violate the written provisions of the franchise agreement testified before the ALJ that their instructions had been misunderstood and that they never suspected the widespread CPA abuse that was occurring at Metro. Ford argued that even if its employees had instructed Metro salesmen to subvert the CPA program, the franchise agreement signed by Ford and Metro provided that those particular employees had no authority to verbally modify the terms of the franchise agreement. Ford further argued, and Metro admitted, that Ford employees did not instruct Metro salesmen to create a "dummy" set of files or to conceal the files containing the names of the actual end-user customers from the Ford auditor.

The ALJ was the sole judge of the credibility of the witnesses and was free to accept the testimony of any witness or even accept "part of the testimony of one witness and disregard the remainder." *Southern Union Gas Co. v. Railroad Comm'n*, 692 S.W.2d 137, 141–42 (Tex. App.—Austin 1985, writ ref'd n.r.e.). Presented with conflicting accounts of the involvement of Ford employees in Metro's CPA program abuse, the ALJ made several findings of fact. First, the ALJ found that although "Ford district and regional personnel were aware of the so-called abuses of the CPA program at Metro and at other dealerships," "Metro personnel, including Mr. Foley, knew that their actions in applying for CPA were contrary to Ford policy." She further found that "Mr. Foley was aware of Metro's CPA practices and authorized and approved of their use, as well as the concealment of these practices from Ford." The ALJ concluded that by "applying for CPA in the names of someone other than its actual customer, not providing all dealership files to the Ford auditor, and providing Ford with false mailing addresses for its customers," Metro failed to comply with its franchise agreement with Ford.

Metro has not contended that no substantial evidence existed in the agency record to support the ALJ's findings that

Metro violated the franchise agreement; thus, we presume that the findings are supported by substantial evidence. *See City of El Paso v. Public Util. Comm'n*, 883 S.W.2d 179, 185 (Tex.1994). Based upon these findings, the Board concluded that Ford established good cause for the termination of Metro's franchise in accordance with sections 5.02(b)(3) and 5.02(b)(5) of the Code. Metro contends that this conclusion was an abuse of discretion because the Board failed to consider Metro's estoppel argument, a legally relevant factor.

■ To establish a claim for equitable estoppel, a party must show that it was without knowledge, or means of acquiring knowledge, of facts that the party sought to be estopped is alleged to have misrepresented by acts, conduct, or silence. *See Schroeder v. Texas Iron Works*, 813 S.W.2d 483, 489 (Tex.1991); *Simpson v. MBank Dallas, N.A.*, 724 S.W.2d 102, 107 (Tex.App.—Dallas 1987, writ ref'd n.r.e.) (citing *Barfield v. Howard M. Smith Co.*, 426 S.W.2d 834, 838 (Tex.1968)). The ALJ found that Metro knew that its actions in applying for CPA were contrary to Ford policy and actively sought to conceal the extent of its misconduct from Ford.[12] Metro has not challenged these findings; therefore, Metro cannot claim that it reasonably or justifiably relied on statements by Ford employees that it was acceptable to provide Ford with a customer name other than the end-user customer for purposes of requesting CPA discounts. *See*

*Douglas v. Aztec Petroleum Corp.*, 695 S.W.2d 312, 317 (Tex.App.—Tyler 1985, no writ). Because Metro does not possess the "clean hands" the law demands of those seeking to invoke the doctrine of estoppel,[13] we hold that the Board did not abuse its discretion by concluding that Ford could seek termination of Metro's franchise. *See Texas Workers' Compensation Ins. Facility v. Personnel Servs., Inc.*, 895 S.W.2d 889, 894 (Tex.App.—Austin 1995, no writ). We overrule Metro's estoppel issue.

■ Finally, Metro contends that the Board abused its discretion by ordering termination for good cause in the absence of evidence that Metro may not perform well as a dealer in the future. Metro argues that franchise termination, as authorized by section 5.02(b)(3) of the Code, is a prophylactic remedy. Metro finds support for its contention in the seven factors listed in section 5.02(b)(5) that the Board must consider to determine whether good cause for termination has been established. Metro contends that these factors demonstrate that termination is designed to "cancel any future dealings between the parties based on indications or fears that the dealer will not perform well in the future." Metro argues that the evidence shows that it ceased applying for CPA in the name of a customer other than the actual customer when instructed by Ford to change its practices in April 1994. Metro contends that there is no evidence to show that it has violated Ford policy since

12. Metro produced no evidence that Ford did anything to lead Metro to believe that field-level employees had any authority to permit abuses or that anyone above field-level employees induced Metro to commit the abuses.

13. In 1982, Ford recommended a $3.2 million chargeback and termination of Metro's franchise due to Metro's alleged abuse of the Used Truck Allowance program. Metro sued Ford to prevent the chargeback and proposed termination. The case was settled, and the settlement terms included a payment by Metro to Ford of $518,082, the removal of Foley, Sr. as dealer-principal, and the appointment of Foley, Jr. as the new dealer-principal. Foley,

Jr. signed a document at that time assuring Ford that "all reasonable steps" would be taken to prevent any future misrepresentations or wrongful receipt of monies. In 1990, Ford revoked a CPA package for Equipment Southwest, a company owned by Foley, Jr.'s brother, after complaints by other Ford dealers that Equipment Southwest was not complying with CPA program guidelines. Thereafter, Ford required Metro to utilize the CPA appeal process for sales to Equipment Southwest. We refer to these episodes only to show that Metro was on notice that Ford management would not countenance misrepresentations.

that time; therefore, Metro argues that the Board abused its discretion by ordering termination based on past wrongs.

■ We find Metro's argument to be without merit. Section 5.02(b)(5) mandates a consideration of "existing circumstances," not a speculative evaluation of what kind of relationship a manufacturer and dealer might have in the future. *See* Tex.Rev.Civ. Stat. Ann. art. 4413(36), § 5.02(b)(5). The Board is authorized to evaluate the dealer's past and current performance with regard to sales, service, warranties, and compliance with franchise agreements. *See id.* Nothing in section 5.02(b)(5) supports Metro's interpretation. Even assuming the section does contain an element of prognostication, Metro's argument still fails because its pattern of CPA program abuse and admitted efforts to deceive Ford violate basic and fundamental precepts of the relationship between a manufacturer and a dealer and reasonably support a conclusion that Metro will probably not perform according to the terms of its franchise agreement if allowed to remain a dealer. The undisputed facts alone justify Ford's actions in terminating Metro. We overrule Metro's final issue concerning termination.

### Transfer of Metro Dealership to Eileen Beard

■ Metro next argues that the ALJ's findings concerning Eileen Beard are not reasonably supported by substantial evidence. In finding of fact 40, the ALJ found "Ms. Beard knew or should have known about the CPA practices at Metro." In finding of fact 41, the ALJ found that "[a]lthough she has ample experience in all areas of Metro's operations, Ms. Beard is not qualified, in terms of character and

capacity, to become the dealer-principal at Metro." The ALJ concluded that "Ford has established that the transfer of Metro to Eileen Beard will be detrimental to the public and/or Ford's representation in accordance with § 5.02(b)(8) of the Code." [14] The Board adopted the ALJ's findings and conclusions and ordered that Metro's franchise be sold to a buyer acceptable to both Ford and Freightliner at a price established by an independent appraiser.

■ We must determine whether the evidence as a whole is such that reasonable minds could have reached the conclusion that the Board must have reached to justify the action. *See Texas State Bd. of Dental Examiners v. Sizemore,* 759 S.W.2d 114, 116 (Tex.1988); *Southwest–Tex Leasing Co. v. Bomer,* 943 S.W.2d 954, 957 (Tex.App.—Austin 1997, no writ). The test is not whether the Board reached the correct conclusion, but whether some reasonable basis exists in the record for the Board's action. *See City of El Paso,* 883 S.W.2d at 186.

At the contested case hearing, Ford had the burden of proving that the transfer of Metro to Beard would be detrimental to the public or the representation of Ford. Ford submitted as an exhibit the deposition testimony of Joan Dupree, the Metro business manager at the time Ford audited Metro. Dupree testified that the Ford auditor met with her and Beard and asked them to produce paperwork relating to numerous truck sales. Dupree testified that Foley *and* Beard decided to provide the auditor with the "deal files," which contained documents bearing the names of the customers for whom appeal CPA had been requested, but not the "white files," which contained documents bearing the

---

14. The version of section 5.02(b)(8) in effect at the time of the contested case hearing provided, "Notwithstanding the terms of any franchise agreement, [it is unlawful for a manufacturer to] fail to give effect to or attempt to prevent any sale or transfer of a dealer, dealership or franchise or interest therein or management thereof unless, after a complaint or protest, it is demonstrated to the Commission after hearing that the result of any such sale or transfer will be detrimental to the public or the representation of the manufacturer or distributor." Act of April 19, 1993, 73d Leg., R.S., ch. 61, sec. 7, § 5.02(8), 1993 Tex. Gen. Laws 139, 141.

names of the actual end-user customers. Dupree testified that she understood it was important to Metro that the Ford auditor not see the white files "[b]ecause it would show who the unit actually was sold to and it would jeopardize how much CPA money we got." Dupree further testified that she and Beard gathered the deal files for the Ford auditor to review. Finally, Dupree testified that the decision to conceal the amount of profit Metro made on a transaction by misrepresenting that it was performing installation of equipment on trucks was made by her, Foley, sales manager Joel Laxson, and Beard.

At the hearing, Beard testified that she had been aware of the existence of two sets of files at Metro. She testified that Foley had instructed her to produce the deal files for the Ford auditor and that had Foley asked her to produce the white files, she would have done so. Beard further testified that she did not learn of the fictitious installation and repair claims made to hide profits until the audit.

Beard was asked if, as a prospective Ford dealer, "it would ever be permissible to make a misrepresentation of fact in order to obtain money from Ford under any circumstances." Beard first testified that if a Ford employee told her to submit false information to Ford, she would do her best to verify that the employee was authorized to give such an instruction. She then acknowledged that she would be willing to misrepresent facts if it seemed reasonable for her to do so.

With regard to Beard's testimony, Metro argues that the questions Beard was asked by Ford's counsel were "purely speculative and argumentative in the extreme" and contends that her answers do not support the conclusion that she lacks the character and capacity to serve as the Metro successor dealer. Metro also contends that Dupree's testimony does not establish that Beard knew of Metro's CPA practices before the audit. Metro further argues that because new truck sales were not part of Beard's responsibilities, the appropriate inference for the ALJ to make was that Beard was not aware of Metro's CPA practices. Finally, with regard to Beard's involvement with the audit, Metro argues that the Ford auditor only asked for the deal files, so Beard cannot be faulted for producing exactly what was requested.[15]

Having reviewed the relevant evidence relating to Beard's involvement in the events in question, and giving due deference to the ALJ's assessment of the credibility of witness testimony, we conclude that relevant evidence exists from which reasonable minds could conclude that as Metro's general manager, Beard knew, or should have known, of Metro's deception and abuse of the Ford CPA program. *See Sizemore,* 759 S.W.2d at 116. The evidence relating to her role in Metro's misconduct calls into question her ability to abide by the terms of the franchise agreement as a dealer-principal. Because some reasonable basis exists in the record for the Board's conclusion that the transfer of Metro to Beard would be detrimental to the public or Ford, we overrule Metro's issue concerning the transfer.

**Ford's Complaint Concerning Chargeback**

Paragraph 12(b) of the Ford/Metro franchise agreement requires that Metro allow Ford:

> to check and instruct [Metro] in the proper handling of warranty and other repairs and claims based thereon and to examine, copy and audit any and all of [Metro's] records and documents.

15. The Ford auditor, Eric Showgren, testified that before he began the audit, he asked Foley to provide him with Metro's deal files, which Showgren believed would contain buyer's order forms and financing information. The evidence shows that the deal files provided to Showgren contained those documents bearing the names of the "dummy" customers, while the white files contained those documents bearing the names of the actual truck purchasers.

[Ford] may charge back to [Metro] all payments or credits made by [Ford] to [Metro] pursuant to such claims or otherwise which were improperly claimed or paid.

Paragraph 17(b)(2) provides that the submission of false information relating to heavy duty truck sales discounts may result in the termination or nonrenewal of Metro's franchise.

At the contested case hearing, Ford argued that taken together, these paragraphs authorize recovery of funds obtained by Metro as a result of CPA program misrepresentations. Metro responded that neither provision specifically provides for chargeback of CPA overpayment. Metro further argued that Ford's proposed chargeback violated section 5.02(b)(14) of the Code, which provides that notwithstanding the terms of any franchise agreement, vehicle manufacturers may not require dealers to pay or assume "any part of any refund, rebate, discount, or other financial adjustment made by the manufacturer ... to, or in favor of, any customer of a dealer, unless voluntarily agreed to by such dealer." Tex.Rev.Civ. Stat. Ann. art. 4413(36), § 5.02(b)(14).

At the conclusion of the hearing, the ALJ found that CPA discounts, although paid directly to dealers by Ford, are granted to dealers in favor of retail customers. Based upon this finding, the ALJ concluded, "Ford is prohibited from charging back monies received by Metro in conjunction with Ford's CPA program on the 317 trucks at issue in this proceeding in accordance with § 5.02(b)(14) of the TMVC Code." The district court affirmed the Board's conclusion.

■ On appeal, Ford argues that section 5.02(b)(14) of the Code does not apply to the CPA program. Ford contends that because CPA funds are paid directly to dealers, not to the end-user customers, the funds cannot be considered discounts or financial adjustments made to or "in favor of" a dealer's customer. *See id.* Instead, Ford argues that CPA discounts are actually discounts or financial adjustments made to or in favor of Ford *dealers* to assist them in selling trucks and remaining competitive in the marketplace. Ford contends that the Board's interpretation of section 5.02(b)(14) impermissibly shields dealers from fraud liability when they fraudulently induce manufacturers into granting CPA discounts. Metro responds that CPA discounts are made in favor of its customers and thus fall squarely within the protection of section 5.02(b)(14).[16]

■ To address Ford's arguments, we first must determine whether the ALJ's finding that CPA discounts are made in favor of a dealer's retail customers is supported by substantial evidence. As previously stated, substantial evidence is that which reasonable minds could have viewed as supporting the finding. *See Sizemore,* 759 S.W.2d at 116. Because we may not substitute our judgment for that of the Board on the weight of the evidence, we are concerned only with the reasonableness of the findings, not their correctness. *See id.* at 117. The complaining party has the burden to demonstrate an absence of substantial evidence. *See id.* at 116.

**16.** Metro also argues in two footnotes that the Board lacks jurisdiction to award money damages to Ford based upon Metro's abuse of the CPA program. We regard Metro's argument as a challenge to the Board's statutory and constitutional authority to adjudicate Ford's chargeback claim. *See, e.g., Kawasaki Motors Corp. v. Texas Motor Vehicle Comm'n,* 855 S.W.2d 792, 797–99 (Tex.App.—Austin 1993, no writ) (agency not empowered to adjudicate contract claim between private individuals arising out of franchise agreement because such power not implied in statute making certain acts unlawful). Because Metro failed to raise this argument before either the Board or the Travis County district court that reviewed the Board's final order, we have no jurisdiction to consider it. *See Yamaha Motor Corp. v. Motor Vehicle Div.,* 860 S.W.2d 223, 229–30 (Tex.App.—Austin 1993, writ denied); *see also Dreyer v. Greene,* 871 S.W.2d 697, 698 (Tex.1993) (generally, a party may not raise an issue, even a constitutional claim, for the first time on appeal).

In general, the evidence presented at the contested case hearing indicated that Ford provides CPA discounts to its dealers to enable them to reduce wholesale truck prices below street prices. The amount of CPA granted depends upon many factors, including the identity of the end-user customer. Upon receiving a CPA discount, Ford dealers are free to decide if and in what amount the discount will be passed on to the retail customer. Foley testified that Metro, rather than retaining CPA funds received from Ford, passed the discount on to retail customers in the form of lower retail prices. Metro heavy truck salesman Allen Ludwig testified that CPA discounts were "always" passed on to the end-user customer.[17]

Ford regional sales manager Mike Steckler testified on cross-examination that "in most normal situations" Ford dealers pass on CPA discounts to their retail customers in the form of lower prices. Finally, John Merrifield, the general sales and marketing manager for Ford heavy truck, testified on cross-examination that CPA discounts were granted to Ford dealers to increase competitiveness by enabling Ford dealers to reduce the retail prices of their trucks. We hold that substantial evidence exists to support the ALJ's finding that CPA discounts were granted by Ford to Metro in favor of Metro's retail customers.

Ford next contends that the Board's interpretation of section 5.02(b)(14) impermissibly prohibits Ford from collecting monies received by Metro in conjunction with the CPA on the 317 trucks at issue. Ford argues that the legislature did not intend for section 5.02(b)(14) to shield dealers who fraudulently obtain CPA discounts from liability.

■■■■ Statutory construction is a question of law. *See Johnson v. City of Fort Worth,* 774 S.W.2d 653, 656 (Tex. 1989). Our objective when we construe a statute is to determine and give effect to the legislature's intent. *See Liberty Mut. Ins. Co. v. Garrison Contractors, Inc.,* 966 S.W.2d 482, 484 (Tex.1998). The resolution of an issue of statutory construction must begin with an analysis of the statute. *See Cail v. Service Motors, Inc.,* 660 S.W.2d 814, 815 (Tex.1983). The legislature's intent is determined from the plain and common meaning of the words used. *See St. Luke's Episcopal Hosp. v. Agbor,* 952 S.W.2d 503, 505 (Tex.1997).

■■■■ Construction of a statute by the administrative agency charged with its enforcement is entitled to deference, so long as the construction is reasonable and does not contradict the plain language of the statute. *See Tarrant Appraisal Dist. v. Moore,* 845 S.W.2d 820, 823 (Tex.1993); *Texas Utils. Elec. Co. v. Sharp,* 962 S.W.2d 723, 726 (Tex.App.—Austin 1998, pet. denied). This is particularly true where the statute is ambiguous due to the complexity of the subject matter. *See Texas Ass'n of Long Distance Tel. Co. v. Public Util. Comm'n,* 798 S.W.2d 875, 884 (Tex.App.—Austin 1990, writ denied).

■■■■ The Board does not interpret section 5.02(b)(14) to allow a manufacturer to assess chargebacks to a dealer if the manufacturer determines that the dealer has committed fraud with respect to the CPA program. We conclude that the Board's interpretation is not unreasonable. The plain language of section 5.02(b)(14) extends broad protection to dealers with regard to "any refund, rebate, discount or other financial incentive" made by the manufacturer "to, or in favor of, any customer of a dealer." Tex.Rev.Civ. Stat. Ann. art. 4413(36), § 5.02(b)(14). No reference is made to excluding from this protection dealers who obtain customer discounts through the misrepresentation of customer names. *See id.* The absence of any reference to dealer misconduct is meaningful, as we must presume that every word in the section has been used for a

---

17. Metro general sales manager Joel Laxson acknowledged that at times Metro passed on less than the full amount of the discount to its customers.

purpose and that every word excluded was excluded for a purpose. *See Southwestern Bell Tel. Co. v. Public Util. Comm'n,* 888 S.W.2d 921, 926 (Tex.App.—Austin 1994, writ denied) (citing *Cameron v. Terrell & Garrett, Inc.,* 618 S.W.2d 535, 540 (Tex. 1981)). We must take the statute as we find it, and we are not responsible for legislative omissions. *See Continental Casualty Ins. Co. v. Functional Restoration Assocs.,* 43 Tex. Sup.Ct. J. 573, 580 (April 6, 2000).

Our conclusion that the Board's interpretation of section 5.02(b)(14) is not unreasonable is bolstered by a recent amendment to the Code that left that section intact but added a new section 5.02B entitled "Manufacturer or distributor incentive programs; procedures." *See* Act of May 19, 1999, 76th Leg., R.S., ch. 1047, § 14, 1999 Tex. Gen. Laws 3873, 3875 (codified at Tex.Rev.Civ. Stat. Ann. art. 4413(36), § 5.02B (West Supp.2000)). Section 5.02B(b) provides that manufacturers "may make charge-backs to a dealer if after audit the manufacturer ... has reasonable grounds to conclude that the dealer committed fraud with respect to the incentive program." Tex.Rev.Civ. Stat. Ann. art. 4413(36), § 5.02B(b).

When the legislature enacts an amendment, we may presume that it thereby intended to change the original act by creating a new right. *See Durish v. Channelview Bank,* 809 S.W.2d 273, 277 (Tex.App.—Austin 1991, writ denied) (citing 1A Singer, *Sutherland Statutory Construction* § 22.30, at 265 (4th ed.1985)); *Adams v. Board of Chiropractic Examiners,* 744 S.W.2d 648, 656 (Tex.App.—Austin 1988, no writ). This presumption is especially applicable here, where the amendment fills an apparent void in the statutory scheme and does not merely reiterate long-standing interpretations that the Board and the courts have given the statute. *See Adams,* 744 S.W.2d at 656. Thus, the Board's conclusion that section 5.02(b)(14) does not permit Ford to collect chargeback from Metro in the context of

*this* administrative proceeding is consistent with the notion that the legislature, in enacting section 5.02B, granted manufacturers a new right to collect chargeback from dealers who commit fraud with respect to incentive programs. We reject Ford's contention that the Board erred by not awarding chargeback in this proceeding.

### Conditional Termination

Metro filed its original complaint and protest with the Board in December 1994. In February 1995, Ford initiated termination proceedings against Metro. During the February 1997 contested case hearing, Ford announced its intent to sell its heavy duty truck assets to Freightliner. Later that year, the ALJ joined Freightliner as a party and ordered it to provide trucks to Metro pursuant to the terms of the Ford/Metro franchise agreement throughout the pendency of the administrative proceeding.

In the PFD, the ALJ concluded that "a reasonable resolution to Ford's request for termination of Metro's franchise agreement is for Metro to be require [sic] to sell the dealership to a buyer of Ford and Freightliner's choosing at a price established by an independent appraiser." The Board accepted this recommendation and ordered that two appraisers selected by Ford/Freightliner and Metro choose a third appraiser to determine the fair market value of Metro "without any devaluation for the proposed termination or other matters at issue in this proceeding." The Board further ordered Ford and Freightliner to make all reasonable efforts to find a buyer acceptable to both entities to purchase Metro at the appraised value; that Metro enter in good faith into a buy-sell agreement with that buyer at the established price; and that upon closure of the buy-sell agreement, Metro's franchise agreement with Ford be terminated.

Upon review, the district court concluded that although the Board had the power to impose a remedy short of complete ter-

mination, the remedy imposed in this case was unlawful. The court reversed the order and remanded the case to the Board to fashion a new remedy consistent with the ruling.

Freightliner argues that the Board had no power to compel it either to treat Metro as a franchised dealer pending the outcome of the administrative proceeding or to condition the franchise termination on the finding of a buyer. Freightliner requests we reverse the district court judgment in part to allow the district court to render judgment consistent with this opinion. Ford contends the Board had no authority to place conditions on the termination of Metro's franchise once Ford established good cause for termination. Ford therefore requests we reverse the district court judgment in part and render judgment unconditionally terminating the franchise.

■ Metro and the Board argue that the Board had authority both to join Freightliner as a party and to fashion a remedy short of termination. The Board requests we reverse the portion of the district court judgment that declares the Board's remedy unlawful and render a judgment affirming the Board's order. Metro requests we reverse the district court judgment and remand for entry of an order instructing Freightliner to deal with Metro until Freightliner shows good cause under the Code to cease such dealings. We will first consider the question whether the Board had the power to join Freightliner as a party to the administrative proceeding upon learning that Freightliner and Ford had entered into an agreement by which Freightliner would purchase Ford's heavy truck assets.

■ Administrative agencies are created by statute and have no inherent authority. *See Public Util. Comm'n v. GTE–Southwest, Inc.,* 901 S.W.2d 401, 406 (Tex.1995); *Sexton v. Mount Olivet Cemetery Ass'n,* 720 S.W.2d 129, 137 (Tex. App.—Austin 1986, writ ref'd n.r.e.).

Therefore, they may only exercise those specific powers the law confers upon them in clear and express language. *See Kawasaki Motors Corp.,* 855 S.W.2d at 797. An agency may also exercise powers necessarily implied from the statutory authority granted or the duties expressly given or imposed. *See Sexton,* 720 S.W.2d at 137. However, the agency may not, on a theory of necessary implication from a specific power, function, or duty expressly delegated, erect and exercise a new or additional power or a power that contradicts the statute. *See id.* at 137–38. Nor may it exercise a new power solely for administrative purposes of expediency. *See id.* at 138.

Section 3.01(a) of the Code vests the Board with the power "to regulate all aspects of the distribution, sale, and leasing of motor vehicles and to do all things, whether specifically designated in this Act or implied herein, or necessary or convenient to the exercise of this power and jurisdiction, including the original jurisdiction to determine questions of its own jurisdiction." Tex.Rev.Civ. Stat. Ann. art. 4413(36), § 3.01(a). Section 3.08A(a) delegates to the Board the power to impose a statutory stay to preserve the status quo until the administrative proceeding is concluded by a final order. *See id.* § 3.08A(a). Persons receiving notice from the Board of the stay may not allow or commit any act or omission that would (1) constitute a violation of the Code; (2) constitute a violation of any rule, order, or decision of the Board; (3) affect the legal rights, duties, or privileges of any party before the Board; or (4) tend to render ineffectual a Board order in any pending proceeding. *See id.*

The Board is expressly authorized to levy civil penalties against parties found to have violated the Code or any rule or order of the Board issued pursuant to the Code. *See id.* § 6.01(a). The Board also has the power to issue cease and desist orders and injunctions to manufacturers and dealers and to revoke or suspend their

licenses for violations of the Code or Board rules or orders promulgated under the Code. *See id.* §§ 4.06(a), 6.01A, 6.02.

Freightliner argues these provisions do not expressly authorize the Board to order a manufacturer to enter into an involuntary franchise agreement with a dealer with whom the manufacturer had no previous relationship. Freightliner further argues that it was not necessary for the Board to involve Freightliner in the administrative proceeding because the Board could have maintained the status quo by exercising its enforcement powers against Ford. The Board responds that under the unique circumstances of this case, it was justified in adding Freightliner as a party and enforcing the statutory stay against it. We agree.

The status quo to be maintained in this case involved Metro receiving and selling trucks pursuant to the terms of its franchise agreement with Ford. Once Ford sold its heavy duty truck assets to Freightliner in May 1997, it was no longer in a position to supply Metro with trucks and parts; thus, administrative penalties imposed against Ford would not have resulted in the maintenance of the status quo. Only the addition of Freightliner to the proceeding and the imposition of the statutory stay against it ensured that Metro would be allowed to function as a franchised dealer throughout the pendency of the hearing. Had the Board failed to join Freightliner as a party, in light of the pendency of the proceeding, Ford would have been allowed to stop supplying Metro with trucks without first establishing that good cause for termination existed. Manufacturers are prohibited by the Code

from altering their business structure in a manner that results in termination of a franchise without good cause. *See id.* § 5.02(b)(17). Without deciding whether Ford altered its business structure,[18] we conclude that the addition of Freightliner as a party was necessary to preserve the status quo and to prevent Ford from selling its heavy duty truck assets unimpeded by regulatory requirements.

■ We now must consider whether the Board was authorized to condition termination of Metro's franchise on Ford and Freightliner finding a buyer willing to pay the appraised value. We reiterate that the Board has only such powers as are delegated to it by the legislature in clear and express statutory language, together with any implied power that may be necessary for the Board to perform a function or duty that the legislature has required of the agency in express terms. *See GTE Southwest Inc. v. Public Util. Comm'n,* 10 S.W.3d 7, 12 (Tex.App.—Austin 1999, no pet. h.). The Board has referred us to two Code provisions it argues provide a statutory basis for the conditional termination.

First, the Board points to section 5.02(b)(5)(B), which requires a consideration of "all the existing circumstances" in determining whether good cause has been established for termination, including the dealer's investment and obligations. *See* Tex.Rev.Civ. Stat. Ann. art. 4413(36), § 5.02(b)(5)(B). The Board argues that it balanced Metro's admitted abuse of the CPA program with Ford's role in contributing to the misconduct and crafted a resolution that ensured Metro would recoup its twenty-five year investment in the franchise by receiving appraised value. Next, the Board relies on section 5.02(b)(3)(C),

**18.** Both Ford and Freightliner argue at length that the district court erred in affirming the ALJ's finding that "Freightliner *acquired* the Ford heavy duty truck body when it purchased the assets of Ford Heavy Truck." (emphasis added.) Ford and Freightliner contend the only evidence admitted during the contested case hearing concerning the transaction confirmed that the deal was structured strictly as an asset purchase and that Freightliner did not acquire Ford's obligations to its

dealers; thus, they argue the Board could not compel Freightliner to deal with Metro. While we acknowledge that the evidence shows Ford's relationships with its dealers were neither transferred to nor acquired by Freightliner, we conclude nonetheless that the Board had the power to join Freightliner as a party and subject it to the statutory stay in order to carry out the requirements of the Code.

which mandates that upon termination, a manufacturer must establish another franchise in the trade area within a reasonable time unless it is shown to the Board by a preponderance of the evidence that the area cannot reasonably support such a dealership. *See id.* § 5.02(b)(3)(C). The Board contends that there was no indication that Ford or Freightliner had prepared to honor this provision; thus, the Board argues that by conditioning termination on the sale of the franchise to another dealer, it was merely ordering Ford and Freightliner to do something they were already required to do by law.

We find the Board's arguments unpersuasive. Section 5.02(b)(5) merely lists factors the Board must consider in determining whether good cause for termination has been established; it does not address termination remedies. Section 5.02(b)(3)(C) contemplates post-termination events but does not authorize the Board to condition termination on, inter alia, the manufacturer finding a third party to purchase the terminated franchise at appraised value. To the contrary, the provision envisions a termination followed by the establishment of a *new* franchise within a reasonable time. The Board's reliance on these provisions to support the proposed conditional termination is unwarranted. Moreover, the Code expressly provides for a "winding up" procedure upon termination to ensure that the manufacturer reimburses the dealer for various assets, such as new motor vehicles in the dealer's inventory with mileage of 6,000 or less; new, unused, undamaged, and unsold parts and accessories; undamaged signs bearing the manufacturer's trademark; special tools, data processing equipment, and automotive service equipment; and the cost of transporting, handling, packing, storing, and loading any property subject to repurchase. *See id.* § 5.02(b)(16).

Regardless of how perplexing the problem an agency seeks to address, it may not exercise its authority in a manner that is inconsistent with the administrative structure that the legislature enacted. In light of express statutory language requiring the terminating manufacturer to establish another franchise within a reasonable time, we conclude that the forced sale imposed by the Board in this case is inconsistent with the legislative intent expressed in the Code's overall regulatory scheme and is an unwarranted exercise of discretion. A power to condition franchise termination on a sale of the entire franchise at a price to be determined by an appraiser along with the other conditions imposed by the Board may not be implied on the ground of necessity from either the Board's general powers or the two specific provisions relied on by the Board.[19] Having concluded that there is substantial evidence to support the Board's finding of good cause to terminate Metro and that the Board's imposition of the specific conditions is unlawful, we affirm the portion of the district court judgment relating to the imposition of the conditions.

### Findings of Fact 46 and 47

■■■ In its final issue on appeal, Ford argues that the district court erred in affirming two findings regarding Ford's ability to control retail prices and dealer profits. Finding of fact 46 states, "In requests for appeal level CPA, Ford is able to determine at what retail price a dealer can sell a truck before Ford must determine what amount of CPA will be granted on the transaction." Finding of fact 47 states, "In requests for appeal level CPA, Ford is able to determine and control the amount of profit a dealer is attempting to make on a particular transaction." Ford argues that because these findings were incorrect and irrelevant to the Board's decision, we should strike them from the Board's final order.

We agree with Ford that the Board could have decided the issues before it

---

19. Although we do not go so far as to hold that the Board can never impose a condition on termination once good cause is found, we hold that the specific conditions imposed in this case are an unwarranted exercise of discretion.

without making the disputed findings; however, the prejudice requirement of Government Code section 2001.174(2) prevents us from reversing the district court unless Ford's substantial rights have been prejudiced by the findings. *See* Tex. Gov't Code Ann. § 2001.174(2). As the challenged findings are not directly connected to any specific grant or denial of relief in the Board's final order, the findings are merely extraneous statements unnecessary to the order and therefore could not have prejudiced any substantial right of Ford. Furthermore, courts generally may disregard immaterial findings. *See Charter Medical–Dallas, Inc.*, 665 S.W.2d at 453. We overrule Ford's final issue.

## CONCLUSION

We affirm the termination of the Metro franchise for good cause, the refusal to transfer the dealership to Eileen Beard, and the denial of Ford's requested chargeback expenses. We affirm the district court judgment holding that the conditions imposed in the order are unlawful for the reasons stated in this opinion, and we remand the cause to the Board for further proceedings not inconsistent with this opinion.