# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-05-00288-CV

**Sterling Truck Corporation and Ford Motor Company, Appellants**

**v.**

**Motor Vehicle Board of the Texas Department of Transportation and
Metro Ford Truck Sales, Inc., Appellees**

## DIRECT APPEAL FROM THE MOTOR VEHICLE BOARD
## OF THE TEXAS DEPARTMENT OF TRANSPORTATION

## O P I N I O N

Sterling Truck Corporation and Ford Motor Company appeal from the order by the Motor Vehicle Board of the Texas Department of Transportation concluding that the companies improperly opposed the transfer of truck sales franchises assigned to Metro Ford Truck Sales, Inc. The Board assessed civil penalties against Sterling for $428,000 and Ford for $467,000 based on alleged violations of statutes requiring that they not unreasonably withhold approval of a proposed transfer to a qualified buyer. *See* Tex. Occ. Code Ann. §§ 2301.359, .360, .458 (West 2004). The Board also ordered that Sterling and Ford accept Metro's proposed transfer of the franchise to Stanley V. Graff. We conclude that the Board's order must be reversed because of the Board's failure to give proper effect to a previous decision in a related case by this Court. Accordingly, we reverse the Board's order and remand this cause for further proceedings.

This cause is part of a long-running dispute between Ford and its successors[1] and Metro, a Ford franchisee.[2] In 1995, Ford attempted to terminate Metro's franchise. Metro protested, prompting a proceeding before the Board to determine whether Ford had good cause to terminate the franchise (*Metro I*). *See* Tex. Occ. Code Ann. § 2301.453 (West 2004). That protest triggered entry of a statutory stay that prevented the parties from committing any act or omission that would affect a legal right, duty, or privilege of any party before the Board. *Id.* § 2301.803 (West 2004). In 1998, the Board found that Ford had good cause to terminate the franchise, but imposed conditions on the termination—including that Ford allow Metro to sell the franchise. The district court affirmed the good cause finding, reversed the imposition of conditions on the termination as unlawful, and remanded for further proceedings. This Court affirmed the district court's judgment. *Ford Motor Co. v. Motor Vehicle Bd.*, 21 S.W.3d 744, 748-54 (Tex. App.—Austin 2000, pet. denied). The supreme court denied review on April 5, 2001.

---

[1] In 1997, during the pendency of this dispute, Ford sold the assets of its heavy-duty truck division to Freightliner Corporation and withdrew from selling heavy-duty trucks. Ford continued to manufacture and distribute light- and medium-duty trucks through its franchisee dealers, including Metro. Ford heavy-duty truck dealers in good standing could apply to be Freightliner franchisees. The administrative law judge joined Freightliner as a necessary party to the proceeding and made Freightliner subject to the stay, requiring Freightliner to provide Metro with the same heavy-duty trucks that Ford had provided.

When Freightliner formed Sterling Truck Corporation to manufacture the former Ford heavy-duty truck line, Sterling stepped into Freightliner's place in this proceeding and was made subject to the automatic stay.

[2] A more detailed history of the dispute between these companies is set out in a previous opinion by this Court in a related cause. *See Ford Motor Co. v. Motor Vehicle Bd.*, 21 S.W.3d 744, 748-54 (Tex. App.—Austin 2000, pet. denied). Other aspects of the overall dispute are also set out in separate opinions issued along with this one. *See Freightliner Corp. v. Motor Vehicle Bd.*, 03-05-00289-CV (Tex. App.—Austin May 1, 2008) (*Metro I*); *Sterling Truck Co. v. Motor Vehicle Bd.*, No. 03-05-00290-CV (Tex. App.—Austin May 1, 2008) (mem. op.) (*Metro IV*).

In March 2001, Metro agreed to sell its franchise to the Cox Group. Ford opposed the sale and Metro filed a protest with the Board. Although the Cox Group withdrew its purchase offer, the Board heard the cause to determine whether Ford acted unreasonably by withholding approval of the sale to the Cox Group. That contested case became *Metro IV*.[3]

In 2003, Metro proposed selling its franchise to Graff. Although Graff had no experience in the medium- and heavy-truck segment of the market, he had experience in the automotive sales industry. His family has held a dealer franchise since 1953 and Graff himself has been a dealer operator since 1982. When he was proposed as the buyer of Metro's franchise, Graff had not yet decided how he would form or capitalize the entity that would buy the franchise. After receiving the application—which triggered a 60-day decision-making timetable—Ford representatives met with Graff 37 days before the decision on the application was due. At the meeting, Ford provided a list of its criteria and demanded production of 80 items. Ford then rejected the sale based in part on the continuing pendency of *Metro I* and *Metro IV* and in part on Graff's failure to provide all the information requested. Metro filed a protest of the rejection with the Board. That cause became *Metro V* and is the subject of this proceeding.

On February 3, 2005, the Board decided three causes concerning Metro's franchise. In its reconsideration of *Metro I*, the Board withdrew its good cause determination and concluded instead that Ford did not have good cause to terminate Metro's franchise. The Board also ordered Metro to transfer its franchise as ordered in *Metro V*. In *Metro IV*, the Board found Ford's opposition to the sale to the Cox Group to be unreasonable and assessed a $10,000 civil penalty

---

[3] *Metro II* and *III* are not involved in this proceeding.

3

against Ford. In *Metro V*, the Board found that Ford's opposition to this sale based on the failure to resolve *Metro I* and *Metro IV* was not among the permissible bases for opposing a sale, that appellants relied on unreasonable criteria, and that appellants denied the application for reasons not permitted by statute. The Board concluded that both appellants failed to carry their statutory burden to show that Graff was not qualified with respect to moral character or did not meet their requirements for business experience and finances. The Board assessed civil penalties exceeding $400,000 against appellants for improperly and unreasonably blocking the transfer of the franchise to Graff. The Board ordered the franchise transferred to Graff. The manufacturers have appealed the orders in all three causes.

Appellants raise several issues challenging the Board's decision in *Metro V*. Ford argues that the order in this cause violated the statutory stay imposed by the filing of *Metro I*. Sterling argues that the Board lacks jurisdiction over it because Metro and Sterling have no franchisor–franchisee relationship. Sterling contends that the Board determined that there was no such franchise relationship in another contested case involving these parties known as *Metro III* (which is not before us as part of this cause). Both appellants argue that the judicial rejection of the forced sale ordered in *Metro I* prevents the sale ordered in this cause. They contend that, in light of the judicially affirmed finding that Ford had good cause to terminate Metro's franchise, this cause is an impermissible collateral attack and is barred by the doctrines of res judicata and collateral estoppel. Ford also argues that the Board is judicially and equitably estopped from arguing for the transfer of the franchise in this cause because it previously defended its now-withdrawn good cause determination. Both appellants contend that the Board's order is not supported by substantial

4

evidence because of deficiencies in Graff's applications. They argue that their standards for potential franchisees do not violate statutory requirements and that their rejection of Graff's application was not unreasonable.

We review the Board's order under the substantial evidence rule. Tex. Occ. Code Ann. § 2301.751 (West 2004). Under that standard of review,

> a court may not substitute its judgment for the judgment of the state agency on the weight of the evidence on questions committed to agency discretion but:
>
> (1) may affirm the agency decision in whole or in part; and
>
> (2) shall reverse or remand the case for further proceedings if substantial rights of the appellant have been prejudiced because the administrative findings, inferences, conclusions, or decisions are:
>
>> (A) in violation of a constitutional or statutory provision;
>>
>> (B) in excess of the agency's statutory authority;
>>
>> (C) made through unlawful procedure;
>>
>> (D) affected by other error of law;
>>
>> (E) not reasonably supported by substantial evidence considering the reliable and probative evidence in the record as a whole; or
>>
>> (F) arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion.

Tex. Gov't Code Ann. § 2001.174 (West 2000).

Ford argues that the Board's order in *Metro V* violated the statutory stay implemented by the filing of *Metro I*.[4] The statute authorizing the stay provides as follows:

(a) On the initiation of a board proceeding, whether by complaint, protest, or otherwise, a person who receives notice from the board of a statutory stay imposed by this chapter may not allow or commit any act or omission that would:

(1) violate this chapter or any rule, order, or decision of the board;

(2) affect a legal right, duty, or privilege of any party before the board; or

(3) tend to render ineffectual a board order in a pending proceeding.

(b) A statutory stay imposed by this chapter remains in effect until vacated or until the proceeding is concluded by a final order or decision.

(c) A person affected by a statutory stay imposed by this chapter may initiate a proceeding before the board to modify, vacate, or clarify the extent and application of the statutory stay.

Tex. Occ. Code Ann. § 2301.803. This statute bars various types of actions by "a person who receives notice from the board of a statutory stay." *Id.* It does not prevent the Board itself from taking any action during the pendency of the stay. The Board is expressly empowered to vacate its own stay. *Id.* Further, the stay lasts only until the final order or decision. The final order after remand in *Metro I* occurred essentially simultaneously with the final order in this cause. Regardless of the sequence in which the orders were signed, the *Metro I* stay was lifted on the same day as the order in this cause was signed. The Board's order in this cause did not violate its stay in *Metro I*.

---

[4] We addressed a similar issue regarding the statutory stay in *Metro IV* and concluded there was no violation of the stay in that case as well.

6

Sterling contends that Metro lacked standing to complain about its rejection of the transfer and the Board lacked jurisdiction over it because Metro did not hold a franchise to sell Ford or Sterling vehicles. Sterling contends that "the Board, as affirmed by this Court, had already terminated Metro's dealership franchise for good cause." We disagree with this characterization of this Court's previous decision. As discussed in our contemporaneous opinion in *Metro I*, this Court did not terminate Metro's franchise in 2000. Rather, the Court affirmed the finding that Ford had good cause to terminate Metro's franchise.[5] It is undisputed that Metro did not hold a formal Sterling franchise. The closer question is whether a Metro–Sterling franchise agreement—or something sufficiently like one to support the instant review—can be imputed from a combination of statutes, Board orders, and actions by the parties.

To analyze whether the Board had the power to assess the propriety of Sterling's resistance to Metro's proposed sale of its franchise, we must first examine the institutional and legal

---

[5] Sterling cites the page in the 2000 opinion where this Court wrote, "We affirm the termination of the Metro franchise for good cause . . . ." *Ford* (*Metro I*), 21 S.W.3d at 767. However, as set out earlier in that opinion, this Court affirmed the finding of "substantial evidence to support the Board's finding *of good cause* to terminate Metro," not actual termination. *See id.* at 766 (emphasis added). That distinction is subtle. In practice, it may not make a great deal of difference because the review process is triggered by the manufacturer's notice of intent to terminate the franchise. *See* Tex. Occ. Code Ann. § 2301.453(a) (West 2004). Actual termination likely usually follows a finding of good cause to terminate. Nevertheless, the statutes authorize the Board to review whether a manufacturer has good cause to terminate a franchise, not to order the termination. *See id.* §§ 2301.453, .455 (West 2004). As we discuss in our contemporaneous opinion in *Metro I*, the Board in 1998 concluded that "Ford has established *good cause* for the termination of Metro's franchise agreements." *Freightliner*, No. 03-05-00289-CV, slip op. at 3. As we also note in that opinion, the trial court stated in its earlier order in *Metro I*, "The court finds that the board's finding of *good cause* for termination of Metro Ford Truck Sales, Inc. is supported by substantial evidence." *Id.* Thus, the judgment of this Court in 2000 affirming the trial court's judgment affirmed decisions by the trial court and the Board finding good cause to terminate, not actually terminating the franchise. *Id.*

7

framework in which the Board made its decision. Like other agencies, the Board is a creature of statute, its powers and reach limited by its enabling statutes. *See City of Allen v. Public Util. Comm'n*, 161 S.W.3d 195, 209 (Tex. App.—Austin 2005, no pet.) (quoting *Sexton v. Mount Olivet Cemetery Ass'n*, 720 S.W.2d 129, 137 (Tex. App.—Austin 1986, writ ref'd n.r.e.)). The Board is empowered to impose a civil penalty against a person who violates or threatens to violate the occupations code. Tex. Occ. Code Ann. § 2301.801 (West 2004). The Board assessed a civil penalty against Sterling for violating sections 2301.359, 2301.360, and 2301.458 of the occupations code. Section 2301.359 describes the duties of a franchisor and franchisee when the franchisee desires to transfer its franchise or a controlling interest in the dealership. "A dealer must notify the manufacturer or distributor of a vehicle the dealer is franchised to sell of the dealer's decision to assign, sell, or otherwise transfer a franchise or a controlling interest in the dealership to another person." *Id.* § 2301.359(a). The code defines franchise as follows:

> "Franchise" means one or more contracts between a franchised dealer as franchisee and a manufacturer or a distributor as franchisor, including a written communication from a franchisor to a franchisee in which a duty is imposed on the franchisee, under which:
>
> > (A) the franchisee is granted the right to sell and service new motor vehicles manufactured or distributed by the franchisor or only to service motor vehicles under the contract and a manufacturer's warranty;
> >
> > (B) the franchisee is a component of the franchisor's distribution system as an independent business;
> >
> > (C) the franchisee is substantially associated with the franchisor's trademark, tradename, and commercial symbol;
> >
> > (D) the franchisee's business substantially relies on the franchisor for a continued supply of motor vehicles, parts, and accessories; or

(E) any right, duty, or obligation granted or imposed by this chapter is affected.

*Id.* § 2301.002(15) (West Supp. 2007). Within 60 days of receiving notice of a proposed sale of a franchise, the manufacturer or distributor must send a letter "informing the dealer of the approval or the unacceptability of the prospective transferee."[6] *Id.* § 2301.359(d). A motor vehicle manufacturer may not unreasonably prohibit the sale of a franchise. *Id.* § 2301.359(e); *see also id.* § 2301.458. A dealer whose transfer is rejected may file a protest with the Board. *Id.* § 2301.360. The manufacturer or distributor must then establish that the proposed transferee is not qualified. *Id.* If the Board finds that the proposed transferee is qualified, the transfer is effected by law. *Id.* § 2301.360(c).

The Board, adopting a proposal for decision by an administrative law judge ("ALJ"), ruled in *Metro I* that the statutory stay in that case, combined with the sale of Ford's heavy-duty truck

---

[6] Although this subsection does not by its own express terms limit itself to manufacturers or distributors who are in franchise agreements with the dealer proposing the transfer, a fair reading of the statute imposes that limit. *See* Tex. Occ. Code Ann. § 2301.359(d) (West 2004); *see also* Tex. Gov't Code Ann. §§ 311.021, .023 (West 2005) (code construction act). The only part of section 2301.359 that expressly limits itself to the parties to the franchise agreement is subsection (a). Tex. Occ. Code Ann. § 2301.359(a). The dealer is required to notify only "the manufacturer or distributor of a vehicle the dealer is franchised to sell" of the decision to transfer the franchise. *Id.* A manufacturer or distributor is required to inform the dealer of the approval or unacceptability of the proposed transferee 60 days "after the date of receipt of a notice and application under this section." *Id.* § 2301.359(d). Although a dealer could conceivably send notice to manufacturers and distributors not party to a particular franchise agreement, and such "outsider" manufacturers or dealers might have opinions regarding the propriety of a transfer, the outsiders could not stop a proposed transfer merely by disapproving of it. Thus, there would be no need for the Board to regulate the outsiders' disapproval, even if they filed formal disapprovals of the transfer. We conclude that the code empowers the Board to penalize manufacturers or distributors who are parties to franchise agreements and unreasonably disapprove of proposed transfers, but not to penalize persons and entities not parties to those agreements who disapprove.

assets to Freightliner and Sterling, required Sterling to be "substituted" for Ford Heavy Duty in its relationship with Metro.[7] However, there is no finding of any negotiated franchise agreement between Metro and Sterling.

The Board found no franchise agreement between Sterling and Metro in a contested case not before us known as *Metro III*. Tex. Motor Veh. Bd., *Metro Ford Truck Sales, Inc. v. Freightliner Corp.*, Docket No. 00-0029 LIC (Mar. 30, 2001) (Proposal for Decision adopted by Board May 24, 2001). Metro sought access to a new truck created by Sterling. The Board held that, although the stay required Sterling to provide Metro with Ford-based trucks, nothing required Sterling to supply Metro with truck lines Sterling developed after the institution of the stay. The Board ruled that orders made pursuant to the statutory stay in *Metro I* "do not create a franchisor–franchisee relationship between Metro and Sterling."

The Board made findings in the cause before us reflecting the absence of a Metro–Sterling franchise relationship. The Board found that "'but for' the statutory stay, Sterling

---

[7] The administrative law judge in her proposal for decision in this cause quoted the following section of an order from *Metro I*:

> The status quo is that Metro receives and sells Ford medium and heavy duty trucks under a Ford Sales and Service agreement. In view of the sale of Ford Heavy Duty T[r]uck to Freightliner, the only way to maintain the status quo is for Sterling to be substituted in the place of Ford Heavy Duty. Although Sterling has its own dealer agreement, Metro does not have to sign the agreement in order to function as a Sterling dealer. Since Sterling is taking the place of Ford Heavy Duty, the rights and obligations enumerated in the Ford Sales and Service Agreement will control the relationship of Metro and Sterling throughout the pendency of this proceeding. The statutory stay dictates that Metro must continue to function under the same franchise terms and conditions as it did before this case was file[d], irrespective of whether it is Ford or Sterling providing the product.

would have been required to offer Metro a franchise agreement substantially similar to the franchise agreements provided to other former Texas Ford Heavy Duty dealers to avoid a possible violation of Code § 2301.453(b)." The Board also found that "[t]he statutory stay froze the right of Metro, as a Ford Heavy Duty Truck dealer, to be offered a franchise agreement by Sterling." The Board also found that "Metro's right to be offered a Sterling franchise agreement has not diminished over time, it has simply been 'on hold' due to the statutory stay; if Metro prevails in Docket Nos. 95-137 and 96-567, Metro still has the right to be franchised by Sterling." In the Proposal for Decision, the ALJ stated that "whether or not there will ultimately be a franchisor–franchisee relationship between Metro and Sterling still depends on the outcome of Metro I." These findings are difficult to square with the Board's assertion that Sterling was obligated to review Metro's transfer application because it was under Board order to be "in the shoes of Ford Heavy Duty."

While we acknowledge that the relationship between Sterling and Metro is much like that of franchisor–franchisee, it lacks an element essential to require Sterling to review whether Metro's proposed buyer is qualified and, more critically, to subject Sterling to Board scrutiny and penalty for failing to conduct that review properly. Metro had a franchise contract with Ford. Ford was obligated by that franchise agreement to provide trucks to Metro and to decide whether to approve of a proposed transfer of that franchise. When Ford sold its heavy-duty truck line to Freightliner, the Board had the option of lifting the stay and letting the full force of that sale affect Metro's franchise.[8] *See* Tex. Occ. Code Ann. § 2301.803(b), (c); *see also id.* § 2301.453

---

[8] There is some discussion of Metro rejecting a condition-laden franchise offer from Freightliner. That underscores the absence of a franchise relationship between Metro and Ford's successors in the heavy-duty truck line.

11

(termination protest procedures apply from change in ownership of manufacturer). Instead, the Board left the stay in place. While leaving the stay in place may have staved off contested case hearings devoted to Sterling's potential termination of Metro's franchise (by overt termination or by failing to offer a franchise), that decision left Metro the franchisee of Ford, with Ford-like heavy-duty trucks supplied by Sterling. Sterling's relationship with Metro was limited to being a Board-mandated supplier of heavy-duty trucks to Metro. Any franchise relationship was potential only—not actual.

Accordingly, the Board had no basis on which to penalize Sterling for resisting the proposed transfer of a nonexistent franchise. Metro was not "franchised" to sell Sterling vehicles, so Metro was not required to notify Sterling of the proposed transfer of the Ford franchise that might or might not be transmuted into a Sterling franchise offer. Sterling was not required to approve or reject this proposed buyer of a franchise Sterling had not offered or bestowed. The fact that Metro notified Sterling of the proposal and Sterling rejected it does not create a franchise contract. The Board is empowered to penalize manufacturers or distributors who unreasonably oppose the transfer of their own franchises, not those who oppose the transfer either of a franchise to which they are not a party (that might be terminated upon the resolution of a contested case) or of a franchise that they might offer upon the resolution of another contested case proceeding, but that does not yet exist.

We conclude that the Board's imposition of a civil penalty against Sterling for opposing Metro's proposed transfer of its Ford franchise was not supported by substantial evidence and exceeded the Board's power. While the nature of the order was within the Board's power and the parties are within the Board's jurisdiction, the evidence does not support this exercise of

the Board's power over Sterling. We must reverse the Board's finding that Sterling's opposition to Metro's proposed sale violated state law and its assessment of a civil penalty against Sterling. We will remand for further proceedings in accordance with Sterling's requested relief and the restrictions placed on judicial disposition of agency rulings. *See* Tex. Gov't Code Ann. § 2001.174; *Ford Motor Co. v. Butnaru*, 157 S.W.3d 142, 149 (Tex. App.—Austin 2005, no pet.); *Pantera Energy Co. v. Railroad Comm'n*, 150 S.W.3d 466, 474 n.9 (Tex. App.—Austin 2004, no pet.); *Public Util. Comm'n v. GTE-SW*, 833 S.W.2d 153, 175 (Tex. App.—Austin 1992) (op. on reh'g), *aff'd in part, rev'd in part on other grounds*, 901 S.W.2d 401 (Tex. 1995); *Consumers Water, Inc. v. Public Util. Comm'n*, 774 S.W.2d 719, 722 (Tex. App.—Austin 1989, no writ); *see also Marrs v. Railroad Comm'n*, 177 S.W.2d 941, 950 (Tex. 1944). Accordingly, we need not consider the remainder of Sterling's issues because their resolution would not alter our disposition of Sterling's appeal.[9] *See* Tex. R. App. P. 47.1.

Ford contends that this Court's rejection of the forced sale in *Metro I* in 2000 makes this proceeding—reviewing the propriety of Ford's rejection of a proposed sale—an improper collateral attack on the decision in *Metro I*. *See Ford*, 21 S.W.3d at 766. "A collateral attack is an attempt to avoid the binding force of a judgment in a proceeding not instituted for the purpose of correcting, modifying, or vacating the judgment, but in order to obtain some specific relief which the judgment currently stands as a bar against." *Browning v. Prostok*, 165 S.W.3d 336, 346

---

[9] The ensuing portions of the opinion may be read as an alternative basis for our decision regarding Sterling's appeal because many issues presented by Sterling and Ford overlap. Our resolution of appellants' similar arguments regarding the effect of *Metro I* on the imposition of penalties in this case affects Ford and Sterling identically.

(Tex. 2005).  Although Metro may have proposed the sale to Graff in part to avert the ultimate practical *effect* of this Court's previous decision in *Metro I*, this proceeding does not attack the *binding force* of that judgment.  This Court's determination in 2000 in *Metro I* that the Board lacked the authority to force a sale is limited to the context of a proceeding to determine whether a manufacturer has good cause to terminate a franchise.  *See Ford*, 21 S.W.3d at 764-66.  Unlike the statutes defining the good cause determination, the statutory scheme for reviewing protests of rejected sales expressly empowers the Board to require a manufacturer to give effect to a proposed sale to a qualified buyer.  *Compare* Tex. Occ. Code Ann. § 2301.453 (good cause), *with id.* § 2301.360(c) (rejected sale).  In *Metro I*, this Court did not confront, address, or prohibit a parallel, statutorily authorized protest of a manufacturer's rejection of a proposed sale.  The protest of the rejection of the proposed sale in *Metro V* is not a collateral attack on the holdings in *Metro I*.

Ford argues that this proceeding is barred by the doctrines of collateral estoppel and res judicata.  Collateral estoppel bars the re-litigation of issues resolved in a previous suit if: (1) the facts sought to be litigated were fully and fairly litigated in the previous suit, (2) those facts were essential to the judgment in that suit, and (3) the parties were adversaries in that suit.  *HECI Exploration Co. v. Neel*, 982 S.W.2d 881, 890 n.2 (Tex. 1998).  The doctrine of res judicata "prevents a plaintiff from abandoning claims and subsequently asserting them when the claims could have been litigated in the prior suit.  For res judicata to apply, there must be:  (1) a prior final judgment on the merits by a court of competent jurisdiction; (2) identity of parties or those in privity with them; and (3) a second action based on the same claims that were raised or could have been raised in the first action."  *Citizens Ins. Co. of Am. v. Daccach*, 217 S.W.3d 430, 449 (Tex. 2007)

14

(citations omitted). The issues of whether Metro's franchise should be terminated and whether the Board could force a sale in a good cause proceeding were litigated in *Metro I*, but those issues are not present in this proceeding. The issues central to this proceeding—whether Graff was qualified to be a franchisee and whether Ford reasonably rejected the proposed sale—were not litigated in *Metro I*. We are not persuaded that fact questions and claims relating to the proposed sale to Graff should have been brought in a proceeding focused on whether Metro had given Ford good cause to terminate its franchise. The previous judgment in *Metro I* that Ford had good cause to terminate Metro's franchise did not bar Metro from protesting in this cause Ford's rejection of the proposed sale to Graff under the doctrines of res judicata or collateral estoppel.

Although our prior judgment in *Metro I* did not bar this cause, the Board's misapplication of our holding in *Metro I* fundamentally undermines its order in this cause. Ford argued to the Board, as it does in this appeal, that the affirmance of the good cause determination meant that Metro had no franchise to sell or that permitting a sale was inconsistent with the occupations code. As in *Metro IV*, the ALJ found these arguments "unpersuasive" because they oversimplified "a very complex set of decisions" and completely ignored the context of the other findings and conclusions regarding Ford's culpability for events leading to the good cause determination. Tex. Motor Veh. Bd., *Metro Ford Truck Sales, Inc. v. Ford Motor Co.*, Docket No. 04-0010 LIC, at 8 (Dec. 8, 2004) (PFD). The ALJ correctly stated that Metro held the franchise even after the remand and that the good cause finding did "not force Metro to immediately

15

and unconditionally give up its franchise." *Id.* at 9.[10] However, the Board went further in its reconsideration of *Metro I*, believing that the good cause determination itself was within the scope of the remand. As we discuss at greater length in our opinion on the contemporaneous appeal in *Metro I*, however, the good cause determination was judicially affirmed and not remanded. *See Freightliner Corp. v. Motor Vehicle Bd.*, 03-05-00289-CV, slip op. at 19-20 (Tex. App.—Austin May 1, 2008). Thus, the Board assessed a penalty against Ford in this case while under a key misimpression regarding the context of Ford's resistance to the proposed transfer. This error of law in the related case concerning the security of Metro's hold on its franchise plainly affected the Board's decision in this case.

Appellees contend that the Board correctly found that Ford could not consider the pendency of *Metro I* and the possibility that Metro's franchise would be terminated when deciding whether to oppose the transfer to Graff. The statute provides as follows:

> A manufacturer or distributor may not unreasonably withhold approval of an application filed under Subsection (a). It is unreasonable for a manufacturer or distributor to reject a prospective transferee who is of good moral character and who meets the written, reasonable, and uniformly applied standards or qualifications, if any, of the manufacturer or distributor relating to the prospective transferee's business experience and financial qualifications.

---

[10] The legislature did not make termination automatic upon the finding of good cause to terminate. *See* Tex. Occ. Code Ann. § 2301.453(g) ("After a hearing, the board shall determine whether the party seeking the termination or discontinuance has established by a preponderance of the evidence that there is good cause for the proposed termination or discontinuance."). This contrasts with the statute governing reviews of protests of rejected sales, which provides for automatic transfer of the franchise when the Board finds that the rejected prospective transferee is qualified. *See* Tex. Occ. Code Ann. § 2301.360(c) (West 2004).

16

Tex. Occ. Code Ann. § 2301.359(e). The Board opined that Ford's consideration of the other pending cases (including the good cause determination in *Metro I* and the sale proposed in *Metro IV*) and Sterling's assertion that it had no franchise with Metro were violations of the statute because these concerns related to neither Graff's character nor his satisfaction of the manufacturer's requirements.[11]

---

[11] The overarching standard for reviewing a manufacturer's rejection of a sale is reasonableness. *See* Tex. Occ. Code Ann. § 2301.359(e); *see also General Motors Corp. v. Bray*, 243 S.W.3d 678, 686 (Tex. App.—Austin 2007, no pet. h.). A manufacturer's rejection of a proposed sale on grounds that the Board has misconstrued the judicial affirmation of a Board finding does not strike us as unreasonable as a matter of law.

There are other reasons that a manufacturer might reasonably resist a sale based on legal concerns independent of the proposed buyer's moral character or satisfaction of the manufacturer's written qualifications. A manufacturer might oppose a sale on grounds such as (1) the current franchise holder has proposed multiple purchasers in different applications and the manufacturer has accepted one of the others; (2) the proposed buyer has died (if a person) or dissolved (if a business entity); or (3) the seller has filed bankruptcy and the automatic stay prevents the sale (*see* 11 U.S.C. § 362). Rejection of a proposed sale on these grounds *may* be unreasonable depending on the particular circumstances, but deeming them unreasonable as a matter of law is an irrational interpretation of section 2301.359(c). Statutory construction principles presuming that the legislature intends to achieve a just and reasonable result weigh against limiting the permissible bases for opposition to a sale only to those relating to character or qualifications. *See* Tex. Gov't Code Ann. § 311.021. We presume that the Board would not penalize a manufacturer who resists a sale for completely legitimate reasons such as impossibility, illegality, or the manufacturer's possession of a right to terminate the franchise—all reasonable grounds other than those relating to character or qualifications.

Even if the Board felt compelled to find the resistance "unreasonable" under the terms of the statute in such a circumstance, the Board retains the discretion to adjust the civil penalty imposed. The Board apparently exercised this discretion with respect to this franchise, as evidenced by the disparity in the fines imposed in *Metro IV* ($10,000) and *Metro V* ($895,000 total). The Board could elect to impose no civil penalty even if a manufacturer was in technical violation of this statute.

17

Although section 2301.359 may require a manufacturer to approve a transfer to a proposed franchisee of good moral character who meets the manufacturer's written requirements,[12] the civil penalty statute permits the Board to consider other factors when assessing punishment. *See* Tex. Occ. Code Ann. § 2301.801. The assessment of a civil penalty is discretionary. *Id.* Factors the Board may consider include:

(1) the seriousness of the violation, including the nature, circumstances, extent, and gravity of any prohibited act, and the harm or potential harm to the safety of the public;

(2) the economic damage to the public caused by the violation;

(3) the history of previous violations;

(4) the amount necessary to deter a future violation;

(5) efforts to correct the violation; and

(6) any other matter that justice may require.

*Id.* § 2301.801(b). Had the Board understood that the finding that Ford had good cause to terminate Metro's franchise was fixed and not subject to reconsideration on remand, it may well have viewed the circumstances of Ford's rejection of the transfer to Graff differently when applying the statutory factors.

We cannot gauge, however, the extent to which the misapprehension regarding the good cause determination affected the Board's decision in this case. We cannot discern to what extent

---

[12] We express no opinion regarding whether the manufacturers' written standards were reasonable or whether Graff met them.

18

the Board's mistaken belief that the good cause determination was remanded affected the determination that Ford improperly rejected the sale and that a fine was appropriate. It is possible that the Board's order may have been based on the merits of Graff's application irrespective of the status of Metro's franchise. On the other hand, it is more likely that the Board's assessment of Ford's resistance to the sale would have been different had the Board understood that the good cause determination in *Metro I* was not remanded and was not subject to being revisited by the Board. Supporting this view is the ALJ's statement—part of the proposal for decision adopted by the Board—on the importance of the context of the complex set of decisions made concerning the dispute between these parties. Assessing Ford's opposition to the sale in the proper context, the Director of the Motor Vehicle Division of the Texas Department of Transportation[13] may well conclude that no violation occurred or that any violations are less serious and warrant a lesser penalty. The Board's error of law and the uncertainty it engenders regarding the violations found and the penalty imposed require that we reverse the Board's order in this cause and remand for reconsideration and further proceedings.

Having determined to remand this cause based on the effect of the error of law regarding the determination that Ford had good cause to terminate Metro's franchise, we will not review appellants' remaining issues on appeal regarding the support for the findings of violations and the assessment of a civil penalty. Although Ford requests that we reject the Board's holdings supporting the assessment of the civil penalty and render judgment in Ford's favor, we are not

---

[13] The legislature has given the Board's former responsibilities to the Director of the Motor Vehicle Division of the Texas Department of Transportation. *See* Tex. Occ. Code Ann. § 2301.005(a) (West Supp. 2007).

authorized in this type of case to render a judgment that we believe the agency should have rendered if, by doing so, we would usurp the agency's authority. *See* Tex. Gov't Code Ann. § 2001.174; *Butnaru*, 157 S.W.3d at 149; *Pantera*, 150 S.W.3d at 474 n.9; *GTE-SW*, 833 S.W.2d at 175; *Consumers Water*, 774 S.W.2d at 722; *see also Marrs*, 177 S.W.2d at 950. On the record presented, we believe that rendering judgment in favor of Ford would be an unwarranted intrusion on the agency's authority. We need not consider the remaining issues because their resolution would not alter our disposition of this cause. *See* Tex. R. App. P. 47.1.

We reverse the Board's order assessing civil penalties against Ford and Sterling in this cause and remand the cause to the Director of the Motor Vehicle Division of the Texas Department of Transportation for reconsideration of this matter in light of a correct application of this Court's holdings in *Metro I* and further proceedings consistent with this opinion.

_____

G. Alan Waldrop, Justice

Before Justices Patterson, Pemberton and Waldrop

Reversed and Remanded

Filed: May 1, 2008