# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-12-00411-CV

**Metro Ford Truck Sales, Appellant**

v.

**Texas Department of Motor Vehicles, Motor Vehicle Division; Freightliner LLC, n/k/a Daimler Trucks North America LLC; and Sterling Truck Corporation, Appellees**

### DIRECT APPEAL FROM THE MOTOR VEHICLE DIVISION OF THE TEXAS DEPARTMENT OF MOTOR VEHICLES

### M E M O R A N D U M  O P I N I O N

Metro Ford Truck Sales ("Metro") seeks direct judicial review in this Court of two orders signed by the Executive Director ("ED") of the Motor Vehicle Division ("the Division") of the Texas Department of Motor Vehicles ("the Department"). *See* Tex. Occ. Code Ann. § 2301.751(b) (West 2012). Metro contends in three issues that the Division ED did not have the authority to enter the orders, that entry of the orders violated its right to due process, and that the orders were not supported by substantial evidence. We will affirm.

### FACTUAL AND PROCEDURAL BACKGROUND

This cause is part of a long-running dispute between, on one side, Ford Motor Company and its successors, Freightliner Corporation ("Freightliner") and Sterling Truck Corporation ("Sterling"), and, on the other side, Metro, a Ford franchisee. The complex history of

the dispute between these companies has been set forth in detail in several of this Court's opinions[1] and is familiar to the parties. We will not repeat it except as relevant to the issues in this appeal.

The Department, through the Division and its ED, regulates the distribution and sale of motor vehicles in Texas pursuant to the provisions of occupations code chapter 2301. *See id.* §§ 2301.001, 2301.101, 2301.151-.153. The Division licenses vehicle manufacturers/distributors and their franchised dealers and regulates the relationship between them, including hearing disputes over whether a manufacturer/distributor (such as Ford) has shown good cause to terminate one of its dealers (such as Metro). *See id.* §§ 2301.001, 2301.004, 2301.151, 2301.152. Before 2009 the Division was part of the Texas Department of Transportation ("TxDOT"), and the Division ED had the authority to issue final orders in administrative proceedings. *See* Act of May 30, 2005, 79th Leg., R.S., ch. 281, §§ 7.01-.02, 2005 Tex. Gen. Laws 778, 839. In 2009 the Division was moved to the newly created Department. *See* Act of May 23, 2009, 81st Leg., R.S., ch. 933, §§6-8, 2009 Tex. Gen. Laws 2485, 2519-21. Once the Department was created, the Division ED no longer had the authority to make final decisions in administrative cases arising under chapter 2301; that authority was transferred to the Department's Board. *See* Occ. Code § 2301.709(d) (after reviewing contested case, Board "shall issue a written final decision or order").

---

[1] *See Freightliner Corp. v. Motor Vehicle Bd.*, 255 S.W.3d 356 (Tex. App.—Austin 2008, pet. denied) (*2008 Metro I*); *Sterling Truck Corp. v. Motor Vehicle Bd.*, 255 S.W.3d 368 (Tex. App.—Austin 2008, pet. denied) (*Metro V*); *Ford Motor Co. v. Motor Vehicle Bd.*, No. 03-05-00290-CV, 2008 WL 1912102 (Tex. App.—Austin May 1, 2008, pet. denied) (mem. op.) (*Metro IV*); *Ford Motor Co. v. Motor Vehicle Bd.*, 21 S.W.3d 744, 748-54 (Tex. App.—Austin 2000, pet. denied) (*2000 Metro I*).

In opinions handed down in May 2008, this Court remanded *Metro I* for the second time and *Metro V* for the first time. Thereafter, Metro filed for bankruptcy. Freightliner and Sterling sought and obtained relief from the bankruptcy court's automatic stay and filed with the agency a motion requesting that the "Director and the Motor Vehicle Division" enter final orders in the *Metro I* and *Metro V* agency proceedings in accordance with this Court's opinions issued with the judgments remanding the cases. Metro did not file a response to the motion. On February 17, 2012, the Division, acting through its ED, issued orders in the two cases. The order in *Metro I* provided that Freightliner and Sterling[2] were no longer required to supply heavy-duty trucks to Metro pursuant to the franchise agreement Metro had with Ford. The order in *Metro V* included the same provision along with a recitation that there is no franchise agreement between Sterling and Metro and that agency orders made during the proceeding did not create a franchisor-franchisee relationship between them. The *Metro V* order also vacated a civil penalty of $428,000 previously assessed by the agency against Sterling. Each order dismissed Freightliner and Sterling from the respective agency proceedings and became final orders as to them.

Thereafter, Metro filed motions for rehearing asserting that the orders were issued without due process and that the ED lacked authority to issue them. The ED overruled the motions for rehearing. Metro then filed a suit for judicial review in Travis County district court. *See* Occ. Code § 2301.751(a). Sterling removed the case from the trial court to this Court as permitted by the occupations code. *Id.* § 2301.751(b).

---

[2] In 1997, while the administrative proceeding in *Metro I* was pending, Ford sold assets of its heavy-duty truck division to Freightliner. Freightliner then formed Sterling, a wholly owned subsidiary, to produce and distribute its line of heavy-duty trucks.

**DISCUSSION**

*The Director's Authority to Issue the Orders*

In its first issue, Metro contends that the ED did not have the authority to issue the orders. Metro maintains that after 2009, when the Department was created and final-order authority was transferred to its Board, the Division ED no longer had any authority to issue final orders in contested cases involving either a dealer's protest of a manufacturer's decision to terminate a franchise, which was the issue in *Metro I*, *see id.* § 2301.453(g) (board shall determine whether party seeking termination of franchise has established good cause for proposed termination), or a manufacturer's rejection of a dealer's application to transfer ownership of a franchise to another person, which was the issue in *Metro V*, *see id.* § 2301.360 (board must determine whether rejection was reasonable). The Division counters that one of the non-amendatory provisions of the bill creating the Department and transferring both the Division to the Department and its final-order authority to the Department's Board is a "savings clause." According to the Division, this provision expresses the legislature's intent that the former procedure for deciding contested cases such as *Metro I* and *Metro V* continues to control in cases filed before the 2009 amendments, and therefore the ED retains order authority in those cases.

The provision the Division relies on provides:

> The [Department] shall continue any proceeding involving the [Division] . . . that was brought before the effective date of this Act in accordance with the law in effect on the date the proceeding was brought, *and the former law is continued in effect for that purpose*.

4

Act of May 23, 2009, 81st Leg., R.S., ch. 933, § 6.01(d), 2009 Tex. Gen. Laws 2485, 2519-20 (emphasis added). Determining whether this provision expresses the legislative intent advanced by the Division—i.e., that the ED retains final-order authority for cases filed before the 2009 amendments—involves statutory construction and presents a question of law that we review de novo. *See State v. Shumake*, 199 S.W.3d 279, 284 (Tex. 2006). Our primary objective in statutory construction is to give effect to the legislature's intent. *See id.* We find that intent "first and foremost" in the statutory text. *Lexington Ins. Co. v. Strayhorn*, 209 S.W.3d 83, 85 (Tex. 2006). "Where text is clear, text is determinative of that intent." *Entergy Gulf States, Inc. v. Summers*, 282 S.W.3d 433, 437 (Tex. 2009) (citing *Shumake*, 199 S.W.3d at 284; *Alex Sheshunoff Mgmt. Servs. v. Johnson*, 209 S.W.3d 644, 651-52 (Tex. 2006)). Only when the statutory text is ambiguous do we resort to rules of construction or extrinsic aids. *Entergy Gulf States, Inc.*, 282 S.W.3d at 437.

Section 6.02, the non-amendatory provision the Division relies on, unambiguously states that any proceeding that was brought before the effective date of the amendments is governed by the law in effect when the proceeding was brought and that the "former law" continues in effect for that purpose. The legislature's intent, as revealed by the plain text of the statute, was that proceedings that had already been instituted when the new statute took effect should continue under the law as it existed prior to the amendments.

Despite this plain language, Metro argues that because the amendments to the statute include both substantive and procedural changes, the savings clause simply operates to clarify that the *substantive* changes to occupations code chapter 2301 do not apply retroactively to cases already in progress, and only the prior *substantive* law is saved for that purpose. In Metro's view,

5

section 6.02 does not also apply to the *procedural* changes enacted by the 2009 amendments, the legislature intended those changes to have retroactive application, and the prior *procedural* law is not saved. To support this position—one that goes beyond the plain language of section 6.02, which makes no distinction regarding former procedural and substantive law—Metro relies on a provision of the Code Construction Act and case law that distinguishes between substantive amendments, which are presumed to apply prospectively only, and procedural amendments, which are not subject to that presumption. *See* Tex. Gov't Code Ann. § 311.022 (West 2005) (statute is presumed prospective in operation unless expressly made retrospective); *State v. Fidelity & Deposit Co.*, 223 S.W.3d 309, 311-12 & n.2 (Tex. 2007) (same). Metro further argues that while the Texas Constitution prohibits retroactive application of laws that affect vested rights, there is no such prohibition as to procedural and remedial laws that generally do not affect vested rights. *See Subaru of Am., Inc. v. David McDavid Nissan, Inc.*, 84 S.W.3d 212, 222-23 (Tex. 2002) (general rule for prospective operation does not apply for statutory amendment that is merely procedural or remedial).

Metro's argument misses the mark and does not compel the conclusion that the savings clause saves only the substantive portions of the "former law" for application to pending proceedings. While Metro correctly points out that there is no constitutional or other impediment that would have prevented the legislature from making the procedural aspects of the amendments retroactive, the plain language of the savings clause reveals that it chose not to. Rather, the savings clause expresses the legislature's intent that the former law—both its substantive and procedural aspects—remain in effect and govern proceedings involving the Division that were instituted before the effective date of the amendments. Metro's interpretation requires that we consider the words

6

"former law" to refer only to former *substantive* law and not to the *procedures* formerly in place. But there is no indicia of legislative intent that the term "former law" be so limited, and there is no basis for making that inference. The cases Metro relies on that employ presumptions regarding prospective application to treat procedural and substantive amendments differently do so only in the absence of a savings clause revealing the legislature's intent regarding application of the new statute. In the present case, there is no ambiguity in the savings clause at issue. Accordingly, we hold that both the procedural and substantive aspects of the law governing the proceedings prior to the 2009 amendment continue to apply to both *Metro I* and *Metro V*.

Metro asserts that even if the savings clause applies to procedural aspects of the amendments, the ED was still not authorized to issue the orders. The savings clause provides that the proceeding is governed by "the law in effect on the date the proceeding was brought." *Metro I* was filed in 1994, and *Metro V* was filed in 2004. In 1994, final-order authority in proceedings related to dealership termination was vested in the Motor Vehicle Board of TxDOT. Likewise, in 2004 final-order authority in proceedings related to the transfer of a dealership was vested in the Motor Vehicle Board of TxDOT. Metro argues, then, that, according to "the law in effect on the date the proceeding was brought," only the Motor Vehicle Board of TxDOT has the authority to issue orders in *Metro I* and *Metro V*. While the statute's text should be considered first and foremost in determining legislative intent, we are also obligated to avoid construing statutes in a manner that leads to absurd results that the legislature could not possibly have intended, even if the plain text might be susceptible of such an interpretation. *See Entergy Gulf States, Inc.*, 282 S.W.3d at 437 (recognizing "absurd results" limitation on literal reading of statutory text where legislature could

7

not possibly have intended such interpretation). Accepting Metro's interpretation would lead to such an absurd result because it would mean that the 2009 legislature intended for final-order authority in these proceedings to remain with a decision-maker that it had abolished in 2005, four years earlier. *See* Act of May 30, 2005, 79th Leg., R.S., ch. 281, § 7.06(1), 2005 Tex. Gen. Laws 778, 840 (abolishing Motor Vehicle Board of TxDOT and moving its authority to ED of Motor Vehicle Division). The legislature could not have intended for final-order authority to remain with a board that it had abolished, effectively preventing resolution of *Metro I* and *Metro V*. We believe that the only reasonable interpretation of section 6.02 is that proceedings already begun would continue to be governed by the law governing them at the time of the 2009 amendments.[3] At that time, final-order authority was vested in the ED. This was the case because, in contrast to the 2009 amendments, the 2005 amendments did not include a savings clause that saved either substantive or procedural aspects of the former law so as to continue to apply to pending proceedings. Accordingly, cases filed both in 1994 and in 2004 were subject to the 2005 amendments that changed the decision-maker in proceedings such as *Metro I* and *Metro V* from the Motor Vehicle Board of TxDOT to the ED of the Division. As discussed above, in the absence of a savings clause, we presume that the procedural aspects of the amendments applied retroactively and therefore governed both *Metro I* and *Metro V*. Thus, the "law in effect" for both of these cases includes the legislature's transfer of decision-making

[3] Under normal circumstances, the law in effect on the date a proceeding such as *Metro I or Metro V* was filed would be the same as the law governing such a proceeding at the time of the 2009 amendment. Before the 2009 amendments, the law remained the same for approximately five years. Most administrative proceedings still pending would not span both a pre- and post-2005 time frame. It is only because these proceedings now have at least a seventeen-year history, and are still pending despite having been filed before even the 2005 amendments, that there can even be an argument that final-order authority is retained by the non-existent Motor Vehicle Board of TxDOT.

authority from the Motor Vehicle Board of TxDOT to the Division ED. Consequently, the Division ED had the authority to issue both orders at issue here. We overrule Metro's first issue.

### *Due Process and Substantial Evidence*

Metro's second and third issues advance three complaints: (1) that the agency violated its due-process rights by issuing the orders without providing notice to Metro, holding a hearing, or hearing evidence after the 2008 remand; (2) that the orders are not supported by findings of fact and conclusions of law as required by the Administrative Procedure Act; and (3) that the agency's denial of Metro's claim to have a Sterling truck franchise was not supported by substantial evidence.

Sterling and Freightliner filed a motion for entry of final orders with the Division on November 21, 2011. The certificate of service indicates that all counsel of record were served with the motion by facsimile and by certified mail, return receipt requested. Metro does not assert that it did not receive a copy of the motion. Metro does complain that the agency violated its due-process rights by failing to give it notice of any hearing to present applicable evidence. But Metro did not request a hearing on the motion. Plainly, the agency did not provide Metro with notice of any hearing because it did not hold one. And, for the reasons that follow, no hearing was necessary for the agency to enter the orders.

#### 2012 Metro I Order

The Metro I Order issued in 2012 did three things: (1) it lifted, as to Freightliner and Sterling only, a statutory stay that was put in place by the agency in 1994 when Metro initiated the contested case seeking an agency determination that Ford's proposed termination of Metro's franchise violated

9

the statutory prohibition against terminating a franchise without good cause, *see* Occ. Code § 2301.803(a) (statutory stay prohibits party stayed from committing act or omission that would affect legal right, duty, or privilege of any party before agency), (2) it recited that Freightliner and Sterling were no longer required to supply heavy-duty trucks to Metro, and (3) it dismissed Freightliner and Sterling as parties to the contested case. For the reasons that follow, the agency was authorized to take each of these actions without holding a hearing.

Freightliner (and subsequently Sterling) became subject to the statutory stay in 1997 when Ford sold its heavy-duty truck assets to Freightliner and the agency, having determined that requiring Freightliner to continue to supply Metro with vehicles was necessary to maintain the status quo pending the good-cause determination, made Freightliner a party to the proceeding. Metro does not contend that the agency's decision to lift a statutory stay requires evidentiary support or that the agency is required to make findings to justify lifting such a stay. In fact, occupations code section 2301.803(b) expressly provides that "a statutory stay imposed by this chapter remains in effect until vacated or until the proceeding is concluded by a final order or decision." *Id.* § 2301.803(b); *Metro V*, 255 S.W.3d at 373 ("The Board is expressly empowered to vacate its own stay."). In their motion for entry of final orders, Freightliner and Sterling informed the agency that Metro had sold its Ford franchise and asserted that, as a consequence, there was no longer any basis to continue to impose a stay on Freightliner or Sterling that required them to provide trucks to Metro. In fact, the bankruptcy court's order lifting the bankruptcy court's automatic stay to permit Freightliner and Sterling to seek final orders in *Metro I* and *Metro V* recites that the good cause for doing so was the closing of the sale. Put differently, the agency's stated reason for concluding in 1997 that

10

Freightliner and Sterling were necessary parties to the contested case and for imposing the stay on them—i.e., preserving Metro's ability to operate its heavy-duty truck business—no longer existed. The agency had the authority to lift the stay without a hearing, and the administrative record contains evidence of its reason for doing so. *Id.*

Ordering that Freightliner and Sterling were no longer required to supply trucks to Metro followed as a natural consequence of lifting the stay, which was the only thing creating the obligation in the first place. *See Metro V*, 255 S.W.3d at 376 ("Sterling's relationship with Metro was limited to being a Board-mandated supplier of heavy-duty trucks to Metro."). Having sold the assets of its truck franchise, Metro had no further need for trucks. The sale eliminated the agency's reason for requiring Freightliner and Sterling to supply Metro with trucks during the pendency of the contested case to determine whether Ford had good cause to terminate Metro's franchise. Again, no hearing was required for the agency's order to clarify that once the statutory stay was lifted, Freightliner and Sterling were no longer required to supply trucks to Metro.[4] It also follows that the reason Freightliner and Sterling were viewed by the agency as necessary parties to the contested case was so that the agency could order them to continue to supply trucks to Metro pending the outcome of the good-cause determination. Once the need for the truck supply ceased to exist, there was no

---

[4] This Court has previously confirmed that the agency's mandate that Freightliner and Sterling supply trucks to Metro during the proceeding to determine whether Ford had good cause to terminate Metro's franchise did not create a franchisor-franchisee relationship between Metro and Freightliner or Sterling. *See Metro V*, 255 S.W.3d at 376 ("Sterling's relationship with Metro was limited to being a Board-mandated supplier of heavy-duty trucks to Metro. Any franchise relationship was potential only—not actual."). Therefore, the obligation to supply trucks arose solely from the agency's orders and not from any independent relationship between Metro and Freightliner or Sterling.

further reason for Freightliner and Sterling to be parties to the proceeding, and their dismissal was warranted without the need for further hearings or findings.

### 2012 Metro V Order

The Metro V Order issued in 2012 contains the same three provisions discussed above, along with the following three additional orders: (1) that there is no franchise agreement between Sterling and Metro, (2) that orders made pursuant to the statutory stay did not create a franchisor-franchisee relationship between Sterling and Metro, and (3) that a $428,000 penalty assessed against Sterling for interfering with Metro's attempt to transfer its franchise to another owner was vacated. As stated above, this Court had already affirmed that there was no franchisor-franchisee relationship between Sterling and Metro and that the agency's orders did not create one. *See id.* Moreover, this Court had also previously held that in the absence of a franchise relationship, the agency's imposition of a civil penalty against Sterling was not supported by substantial evidence and exceeded the Board's power. *See id.* Specifically, this Court held:

> The Board is empowered to penalize manufacturers and distributors who unreasonably oppose the transfer of their own franchises, not those who oppose the transfer either of a franchise to which they are not a party (that might be terminated upon the resolution of a contested case) or of a franchise that they might offer upon the resolution of another contested case proceeding, but that does not yet exist.

> We conclude that the Board's imposition of a civil penalty against Sterling for opposing Metro's proposed transfer of its Ford franchise was not supported by substantial evidence and exceeded the Board's power.

*Id.* Consequently, no further hearings or evidence was needed to support the agency's action of vacating a penalty that this Court already held was not supported by substantial evidence and

12

exceeded the agency's authority. And, because this Court had already so held, no further hearings or evidence was needed to support the agency's order confirming that no franchise relationship existed between Metro and Sterling. The agency order simply embodied this Court's holding in *Metro V*.

Metro's brief on appeal, however, appears to assert that the two orders were not supported by substantial evidence because of outstanding issues regarding whether Metro is or might become entitled to obtain a Sterling franchise. Metro correctly observes that while this Court's rulings prohibit the agency from revisiting its determination that good cause existed to terminate Metro's franchise, we did not render judgment actually terminating the franchise. *See id.* at 374 n.5 ("[T]he judgment of the Court in 2000 affirming the trial court's judgment affirmed decisions by the trial court and the Board finding good cause to terminate, not actually terminating the franchise."); *id*. at 378 ("The ALJ correctly stated that Metro held the franchise even after the remand and that the good cause finding did 'not force Metro to immediately and unconditionally give up its franchise.'"). But whether or not the franchise has actually been terminated is immaterial to Metro's right to hold a Sterling franchise. As the agency previously found at a time when it believed that the good-cause determination was unresolved, "whether or not there will ultimately be a franchisor-franchisee relationship between Metro and Sterling still depends on the outcome of *Metro I*," and that "if Metro prevails in [*Metro I*], Metro still has the right to be franchised by Sterling." *See id.* at 375-76. In its brief, Metro characterizes this Court's opinion in *Metro V* as recognizing that the agency "held that Sterling's right to deny Metro a Sterling franchise depends upon *the resolution of Ford's efforts to terminate the Metro franchise*." (Emphasis added.) According to Metro, then, until the franchise

13

is actually terminated, which it characterizes as "prevailing" in *Metro I*, its right to a franchise is still an open question. Metro misapprehends this Court's previous opinions. *Metro I* concerned only an agency proceeding to determine *whether Ford had good cause to terminate the franchise*; it was not a proceeding in which the agency was asked to terminate the relationship. *See 2008 Metro I*, 255 S.W.3d at 358 ("Metro filed a protest, triggering a proceeding before the Board to determine whether Ford had good cause to terminate the franchise."). In fact, the agency could not itself have terminated the franchise during this proceeding. *See Metro V*, 255 S.W.3d at 373 n.5 ("Actual termination likely usually follows a finding of good cause to terminate. Nevertheless, the statutes authorize the Board to review whether a manufacturer has good cause to terminate a franchise, *not to order the termination*." (Emphasis added.)). Because the good-cause determination has been made in favor of Ford, Metro has already failed to prevail in *Metro I*, and regardless of whether Ford's actual termination of the franchise has occurred, the agency has found that Ford has good cause to do so; consequently, Metro no longer has a right to a Sterling franchise by virtue of its relationship with Ford. *See 2000 Metro I*, 21 S.W.3d at 754 (Ford's sale of certain assets of its heavy-duty truck division to Freightliner resulted in Ford's withdrawal from nationwide heavy-duty truck market, and Ford heavy-duty truck dealers *in good standing* could apply to Freightliner for franchise agreement); *Metro V*, 255 S.W.3d at 376 (franchise relationship between Freightliner and Metro was potential only). We reject Metro's contention that the order is not supported by substantial evidence based solely on the absence of evidence that the Ford-Metro franchise has actually been terminated.

14

Metro also asserts that certain findings it contends have not been reversed by this Court preclude the agency from having an "evidentiary base upon which to determine Metro's claims for a Sterling franchise should be denied." Specifically, Metro cites an earlier agency finding that "'but for' the statutory stay, Sterling would have been required to offer Metro a franchise agreement substantially similar to the franchise agreements provided to other former Texas Ford Heavy Duty dealers to avoid a possible violation of [occupations code section] 2301.453(b)." This finding, however, was made during the time period that the agency mistakenly believed it had the authority to revisit its good-cause determination and had concluded that Ford did not have good cause. But because the agency was precluded from changing its good-cause determination, it is in fact no longer the case that Sterling would have been required to offer Metro a franchise "but for" the stay. The basis for its right to a Sterling franchise—that it is a Ford dealer in good standing—ceased to exist upon the agency's determination that Ford had good cause to terminate the franchise. Although that right might have appeared to have been temporarily revived by the agency's unauthorized reversal of its good-cause determination, our opinion in *2008 Metro I* made it clear that the apparent revival of that right derived from unauthorized agency action.

Metro also argues that the 2012 Metro I Order and the 2012 Metro V Order are not "in accord with" orders the agency previously made in *Metro V* and that due process requires that the agency include findings of fact and conclusions of law to show the basis for its now coming to a different decision. Specifically, Metro asserts that in its February 2005 order, which was the subject of the *Metro V* appeal, the agency found that Metro had the authority to transfer its franchise to a qualified buyer and that the prospective transferee was qualified as a Sterling heavy-duty truck

15

dealer. The agency also ordered the Ford franchise to be transferred to the prospective transferee and ordered Sterling to provide it with a franchise comparable to that it had issued to other Ford dealers in good standing. Metro contends that, because these findings were not "reversed" by this Court in our *Metro V* opinion, the materially different 2012 Metro V Order must be accompanied by findings showing the basis for a different decision and those findings must have evidentiary support.

Metro's argument depends on the erroneous assumption that the *Metro V* opinion reversed only the penalty portion of the 2005 Metro V Order. Apparently invoking the concept of a limited remand discussed in our *2008 Metro I* opinion, Metro asserts that because we did not specifically reverse the other findings in the order, they remain in place after remand. This is simply not the case. In our *2008 Metro I* opinion, we held that in a suit for judicial review, a court may expressly affirm certain findings and thereby limit the issues the agency is authorized to address on remand. Any intent to limit the scope of remand, however, must be expressly stated. *2008 Metro I*, 255 S.W.3d at 363 n.4. But this is not the same as saying that a court is *required*, in a general remand, to expressly reverse all the agency's findings. Instead, in *2008 Metro I* we observed that a court's power to limit the remand does not "foreclose a court from remanding an entire administrative proceeding based on an error in part of the decision challenged on appeal. The court may find that a single error affected the entire decision-making process such that the agency must have the opportunity to review the case as a whole." *Id.* That is exactly what this Court concluded in *Metro V*. Noting that the agency's mistaken assumption that it had the authority to change the good-cause-for-termination finding may have affected the agency's decision in the underlying proceeding in ways that this Court could not accurately assess, we remanded the cause "based on the

effect of the error of law." *Metro V*, 255 S.W.3d at 380. This was a general remand, returning the cause to the agency to review as a whole. The agency was free to enter a new order without reconsidering the issues regarding the prospective transferee's qualifications or right to receive a Sterling franchise. In fact, those issues were no longer material in light of the fact that the agency was bound by the determination that there was good cause to terminate Metro's franchise. It followed from that finding that Metro no longer had a right to receive a Sterling franchise by virtue of its relationship with Ford and therefore would have nothing to transfer to the prospective transferee regardless of its qualifications.

Both the 2012 Metro I Order and the 2012 Metro V Order include the following introductory paragraph:

> The Director of the Motor Vehicle Division of the Texas Department of Motor Vehicles, having duly considered on remand the May 1, 2008, decision of the Court of Appeals for the Third District of Texas in *Sterling Truck Corp. v. Motor Vehicle Bd. of the Tex. DOT*, 255 S.W.3d 368 (Tex. App.—Austin 2008, pet. denied) and the Court of Appeals' corresponding December 14, 2009, Mandate; the May 1, 2008, decision of the Court of Appeals for the Third District of Texas in *Freightliner Corp. v. Motor Vehicle Bd. of the Tex. DOT*, 255 SW.3d 356 (Tex. App.—Austin 2008, pet. denied) and the Court of Appeals' corresponding December 14, 2009, Mandate; and the Bankruptcy Court's October 6, 2010, Order Granting Sterling Truck Company's Motion for Relief from Automatic Stay on Final Hearing, does hereby enter this Interim Order after Remand.

Thus, the agency expressly set forth the basis for both orders—it was issuing the orders required by this Court's prior opinions and mandates. The ordering paragraphs include legal conclusions that follow directly from this Court's previous rulings. The referenced opinions of this Court and the bankruptcy court provide the background and the basis for the agency's orders. We overrule Metro's

17

second and third appellate issues complaining that the orders were issued without affording it due process and are not supported by substantial evidence.

## CONCLUSION

Having overruled Metro's three appellate issues, we affirm both the 2012 Metro I Order and the 2012 Metro V Order.

_____

J. Woodfin Jones, Chief Justice

Before Chief Justice Jones, Justices Goodwin and Field

Affirmed

Filed:   March 13, 2013

18